## ST. LOUIS-S. F. RY. CO. v. PRINCE.

No. 19699. Opinion Filed Feb. 18, 1930.

Rehearing Denied Oct. 7, 1930.

DIFFENDAFFER, C. This is an action for damages for personal injuries alleged to have been received on October 10, 1927. Defendant in error, hereinafter referred to ·as plaintiff, who was then past 17 years of age, was engaged by his uncle, Roy Elrod, in the exhibition of a picture in certain cities in Oklahoma. The younger brother was working with him. His uncle resided in Cushing, Okla., and on or about October 8, 1927, he directed plaintiff to go to Henryetta, Okla., for the purpose of exhibiting the picture, and on October 10th, he called the plaintiff over the telephone and directed the two boys to return to Cushing that night after the exhibition. They were traveling in a Dodge automobile furnished by their uncle. They left Henryetta some time after 10 o'clock at night, and were driving north on a paved highway leading from Henryetta to Okmulgee, on their way to Cushing. The paved highway runs on the east side of the St. Louis-San Francisco Railway track from Henryetta to a point about 4 miles south of Okmulgee, where the highway curves to the left and crosses the railroad. The railroad track at this point runs nearly north and south and, a few hundred yards north of the intersection, the track curves slightly to the west, but for some 300 or 400 feet north of the intersection, the track is straight and runs west of south about 25 or 30 degrees. About 250 feet north of the intersection the railroad track passes over the track of the Okmulgee Northern Railroad upon an overpass, and immediately south of this crossing, the railroad track is built upon a fill about 8 feet high. This fill decreases in height toward the highway crossing, where it is about 4 feet high. The paved highway as it approaches the crossing from the south leaves the section line at a point about 300 feet from the crossing, and curves uniformly to the west and crosses the railroad track at practically right angles. From the point where the highway leaves the section line to the intersection is up a grade of about 15 per cent. As plaintiff and his brother drove upon the intersection, the car in which they were riding was struck by the engine of a southbound passenger train traveling at about 55 miles per hour. The car was demolished and plaintiff's brother was killed almost instantly, and plaintiff was seriously injured. On account of these injuries this suit was brought.

Plaintiff alleges in his petition that defendant had carelessly and negligently maintained the crossing in a condition extremely dangerous to travelers upon the highway, in "that in approaching said railroad crossing

E. T. Miller and Cruce & Franklin, for plaintiff in error.

W. F. Speakman and Streeter Speakman for defendant in error.

from the south at the times hereinafter alleged therein, were no signs of caution or warning devices maintained by said railroad company at said crossing. That a traveler who did not have actual knowledge that a railroad crossing was in front of him would see and observe no signs or warning of the same when traveling at night until he had actually driven upon the same. That the statutes of this state, Compiled Oklahoma Statutes 1921, and section 5529 thereof provides as follows:

"'Every railroad corporation operating a line of road within this state must erect suitable signs of caution at each crossing of its road with a public highway, which signs shall be painted with black Roman or block letters on white background, "Railroad Crossing—Look Out for the Cars"; said letters to be at least eight inches in, length and proportionately broad; said signs shall be placed at the top of posts at least 15 feet high.'

"That it is the purpose and intention of this statute, as provided for therein, to require railroad companies to maintain such signs of caution in a position so that travelers upon the public highway may see and observe the same.

"That there was but one sign, as described in said statute, erected and maintained at said railroad crossing. That the said railroad company had carelessly and negligently erected the same on the south and west side of the highway and on the north and west side of the railroad track in such a position that one driving at night and approaching said railroad crossing from the south could not see and observe said sign for the reason that the lights of automobiles in which a traveler might be traveling would not reach or reflect upon said railroad crossing sign until the traveler upon the public highway had actually driven upon the said railroad track. That the only other signal device maintained by said railroad company was a small sign about four feet from the ground with the words 'Stop—State Law' painted thereon."

It is then alleged that the highway is a national and state highway through Okmulgee county, and was a paved thoroughfare, and along the same, by night and day, passed great numbers of automobiles and other vehicles.

"That it, therefore, became the duty of said railroad company, on account of the extremely dangerous condition and situation surrounding said railroad crossing, and the great amount of travel upon said public highway, to maintain some kind of electric bell or other signal device to warn travelers of the approach of the trains. That in this duty the defendant made default and failed and refused to install and maintain at the said railroad crossing any kind of signal device and carelessly and negligently failed and refused to erect and maintain any sign of warning or caution such as might be observed by a traveler in approaching said crossing in the nighttime from the south."

It was further alleged that the defendant company knew that the crossing in question was an exceedingly dangerous one, but that notwithstanding such knowledge it operated or caused to be operated the locomotive and train at a high and dangerous rate of speed, to wit, 55 miles per hour, and carelessly and negligently failed and refused to give any signal or warning of their approach, and in so doing drove their train into and against the automobile in which plaintiff was riding, thereby injuring him, etc.

Defendant answered by general denial, and further alleged that plaintiff's injury was due to his own carelessness and negligence, and further pleaded contributory negligence. Plaintiff replied by general denial. Trial was had to a jury resulting in a verdict and judgment for plaintiff in the sum of $10,000.

To review this judgment, defendant appeals, and assign some 26 alleged errors. These assignments are presented under five propositions. The first is: That the verdict is not supported by sufficient evidence. This proposition, defendant says, includes all demurrers and motions which would have the effect of taking the case from the jury, or directing a verdict for defendant.

The question presented is that the court erred in overruling the demurrer, and also in refusing to direct a verdict for defendant. This necessitates an examination of the entire record in order to determine whether or not there is any evidence tending to establish actionable negligence. If there be no such evidence, it necessarily follows that the judgment should be reversed. The court in the instructions told the jury:

"You are told that the evidence in this case fails to show that the defendant railway company was in any manner negligent regarding the sounding of whistles, or giving of signals to be sounded and given by the train crew on the train approaching the crossing at the time of the accident. You are therefore told that you cannot find the defendant negligent regarding this issue."

The record justifies this instruction, and so far as this ground of negligence is concerned, defendant stands absolved.

It is contended by plaintiff that the evidence shows that defendant had failed to comply with the provisions of section 5529, C. O. S. 1921, which provides:

"Every railroad corporation operating a line of road within this state must erect suitable signs of caution at each crossing of its road with public highway, which signs shall be painted with black Roman or block letters, on white background, 'Railroad Crossing—Look Out for the Cars'; said letters to be at least eight inches in length and proportionately broad; said signs shall be placed at the top of posts at least 15 feet high."

It is shown by the evidence that defendant had erected, and on the date in question there was a sign on the west side of the railroad track and on the south side of the highway which in all respects conformed to the requirements of section 5529, supra, as to height of the post, lettering, etc. On the east side of the railroad track and about 43 feet from the east side and about 6 feet to the right of the pavement on the highway was a 'Stop-State Law" sign erected in compliance with the provisions of section 3, c. 101, S. L. 1925, which provides:

"That it shall be the duty of all railway companies operating railway lines within the state to place at all crossings stop signs, with the following inscription thereon 'Stop—State Law,' which signs shall be painted in large letters that may be plainly seen at least 50 yards from them, and any railway company failing to comply with the above provisions shall be deemed guilty of contributory negligence in case of an accident."

It is not contended that either of these signs was not in conformity to the law, but it is asserted that by reason of the peculiar situation surrounding this crossing, the signs thus erected and maintained were not a substantal compliance with section 5529, supra.

Plaintiff asserts that because the statute requires "suitable signs" at "each crossing," and that "said signs shall be placed at the top of posts at least 15 feet high," the words, signs, and posts being in the plural and provided for at "each crossing," this means at least two signs of the description and dimensions prescribed in the section at each crossing. This contention we think untenable. It is clear that the word "sign" has reference to the signs to be erected at all crossings. This section has been in force in this state and territory for nearly 40 years. No one has understood or construed the section to mean that more than one sign is required at each ordinary crossing. We do not think it is so intended. This, of course, is understood to be the minimum requirement as to such signs. The section referred to requires that "suitable signs"

shall be erected and maintained. This means not only "suitable" as to size, dimension, and height of construction, but also a suitable number. If the crossing be of such a nature or of such peculiar construction, or is located so that such sign cannot readily be seen by travelers upon the highway approaching the crossing from either direction, then ordinary care might require that one sign be erected on each side of the railroad.

We have at some length set out the conditions surrounding the crossing, as shown by the pleading and evidence, but there are other things which may be considered in connection with the question of whether or not there is evidence reasonably tending to support plaintiff's claim of negligence in the maintenance of the crossing. Some distance north of the intersection was located a large oil refinery and numerous lights were kept burning therein through the night. Some commercial or advertising signs had been erected along the right side of the highway leading up to the crossing, which signs were illuminated by electric lights. These lights were so arranged that they would have a tendency to cause a driver of an automobile approaching the crossing from the south to confuse them with the headlight on a locomotive approaching the crossing from the north. The large crossing sign above mentioned, and referred to in the record as the "cross arm" sign, was so located that it would not be within the range of vision of a driver of an automobile approaching the crossing at night from the south, and so located that the headlight of his automobile would not shine thereon and thereby make same visible until the driver was very near the railroad. But the evidence shows that a traveler upon the highway approaching the crossing from the south could plainly see a train approaching from the north at various distances ranging from 1,000 feet to more than one-half mile. At a point on the highway 250 feet from the railroad crossing one could see up the railroad track for a distance of some 3,200 feet, or more than half a mile. At a point 150 feet east of the crossing one could see up the railroad track a distance of 2,390 feet, and at 100 feet from the crossing the track was visible for 1,300 feet.

The evidence shows that, as plaintiff and his brother approached from the south, a Ford truck upon which some 11 people were riding was traveling north toward the crossing, at about 12 or 15 miles per hour. Just behind this truck and ahead of plaintiff was a Ford coupe, containing two persons,

traveling a little faster than the Ford truck. About the time the Ford truck reached the point on the highway where the curve to the crossing commenced, the driver of the Ford coupe pulled out and passed to the left and ahead of the truck. About this time the train whistled for the crossing and its headlight appeared in full view. The driver of the Ford coupe heard the whistle, saw the headlight on the locomotive, and brought his car to a stop a short distance from the crossing. The driver of the Ford truck heard the whistle and saw the approaching train and brought the truck to a stop just behind the Ford coupe. The Dodge car in which plaintiff was riding passed both the truck and Ford coupe while rounding the curve, and the driver apparently saw the approaching train after it was too late to stop, as the evidence shows from the marks made on the pavement that the car skidded or slid the wheels for some 20 or 30 feet on the pavement. It may be here observed that the record does not disclose whether the plaintiff or his younger brother was driving the car. The younger brother was killed in the collision, and plaintiff received such injuries to his head, that, at the time of the trial some 4 months thereafter, he apparently remembered nothing of the accident or the events leading up thereto. No flagman nor electric bell or other warning signal or device, aside from the signs, was maintained at the crossing. The fair inference from all the circumstances is, that, as plaintiff approached the crossing in passing the Ford coupe, the "Stop—State Law" sign was hidden from his view by the Ford coupe.

It is well settled in this state that the statute which requires a railroad company to sound a whistle and ring a bell in approaching highway crossings was not intended to furnish a standard by which to determine in every case whether or not such company has failed to discharge its duty in respect to giving sufficient warning to the traveling public of the approach of trains. It is said that it was intended to prescribe the minimum care which must be observed in all cases. M., K. & T. Ry. Co. v. Stanton, 78 Okla. 167, 189 Pac. 753; W. F. & N. W. Ry. Co. v. Groves, Adm'r, 81 Okla. 34, 196 Pac. 677.

The same rule, we think, applies as to the statute requiring the erection and maintenance of suitable warning signs. Section 5529, prior to the enactment of section 3, c. 101, S. L. 1925, supra, prescribed or fixed the minimum duty in this regard, which must be observed in all cases. Now, since the enactment of the so-called "Stop—State Law" section, supra, the two sections taken together prescribe the minimum duty of a railroad company in respect to the erection of suitable signs of caution at railroad crossings. This question of what may be required is not a new one. In St. Louis-San Francisco v. Rundell, 108 Okla. 132, 235 Pac. 491, it was held:

"An instruction which informs the jury that the law does not require the railroad company to maintain a flagman, automatic signals or bells at a railroad crossing, and leaving it to the jury whether the absence of such precaution on the part of the company is negligence under certain conditions, is not necessarily erroneous, but such an instruction is subject to criticism for the reason that it would be better not to point out in an instruction the particular means to be employed by the company in exercising the degree of care required at country crossings, but rather to inform them that if on account of the dangerous character of the crossing and the amount of travel thereon, the statutory signals did not afford reasonably sufficient warning, then such other means as the evidence showed might be and usually were employed by the railroad companies at dangerous crossings should be used, in order to prevent injury to the traveling public."

In the same case, it was also held:

"Neither the Legislature nor the Corporation Commission can arbitrarily determine in advance what would constitute ordinary care or reasonable prudence in a railroad company at a crossing. Each case must stand on its own merits, and the question is ordinarily one for the jury to determine."

And in the body of the opinion, Mr. Justice Lester, speaking for the court, said:

"The authorities above cited abundantly sustain the proposition that railroad companies owe the public the duty of maintaining a flagman, a system of automatic bells, or other safeguards in town and cities at crossings which are unusually dangerous or attended with more than ordinary hazards, especially where the same are much traveled. It cannot be said, of course, that they owe the public this duty at ordinary crossings in the country where there could be no unusual danger or extraordinary hazard. Whether or not any given state of facts describing the surroundings of any particular crossing is such as to make such crossing an extraordinary hazard is a question solely for the determination of the jury, unless only one conclusion could be drawn therefrom by all reasonable men."

It is now well recognized that the duty may exist outside of the statute to provide flagman, gates, automatic bells, or other ade-

quate warning appliances, if the situation of the crossing reasonably requires it. And whether or not the situation of any particular crossing requires such additional warning, signs, appliances, etc., is a question for a jury, where the evidence is such that reasonable men might reach different conclusions therefrom. Grand Trunk Ry. Co. v. Ives, 144 U. S. 408.

In the above case, the following from Central Passenger Ry. Co. v. Kuhn, 86 Ky. 578, is quoted with approval:

"The doctrine with reference to injuries to those crossing the track of a railway, where the right to cross exists, is that the company must use such reasonable care and precaution as ordinary prudence would indicate. This vigilance and care must be greater at crossings in a populous town or city than at ordinary crossings in the country; so what is reasonable care and prudence must depend on the facts of each case. In a crossing within a city, or where the travel is great, reasonable care would require a flagman constantly at the crossing, or gates or bars, so as to prevent injury; but such care would not be required at a crossing in the country, where but few persons passed each day. The usual signal, such as ringing the bell and blowing the whistle, would be sufficient."

It was then said:

"It is also held in many of the states (in fact, the rule is well nigh, if not quite, universal) that a railroad company, under certain circumstances, will not be held free from negligence, even though it may have complied literally with the terms of a statute prescribing certain signals to be given, and other precautions to be taken by it, for the safety of the traveling public at crossings."

After citing a number of cases, illustrative of the rule, Mr. Justice Lamar, speaking for the court, said:

"The reason for such ruling is found in the principle of the common law, that every one must so conduct himself and use his own property as that, under ordinary circumstances, he will not injure another in any way. As a general rule, it may be said that whether ordinary care or reasonable prudence requires a railroad company to keep a flagman stationed at a crossing that is especially dangerous, is a question of fact for a jury to determine, under all the circumstances of the case, and that the omission to station a flagman at a dangerous crossing may be taken into account as evidence of negligence, although in some cases it has been held that it is a question of law for the court. It seems, however, that before a jury will be warranted in saying, in the absence of any statutory direction to

that effect, that a railroad company should keep a flagman or gates at a crossing, it must first be shown that such crossing is more than ordinarily hazardous; as, for instance, that it is in a thickly populated portion of a town or city; or, that the view of the track is obstructed either by the company itself or by other objects proper in themselves; or, that the crossing is a much traveled one and the noise of approaching trains is rendered indistinct and the ordinary signals difficult to be heard by reason of bustle and confusion incident to railway or other business; or, by reason of some such like cause; and that a jury would not be warranted in saying that a railroad company should maintain those extra precautions at ordinary crossings in the country."

But, if like conditions exist at a crossing in the country, we see no reason why the same rule should not apply thereto.

Thus, we have a situation presenting two questions of fact for the jury to determine; viz., was the crossing unusually dangerous? And, if so, did ordinary care or reasonable prudence require that the defendant railroad company erect and maintain other and more conspicuous signs of caution at the crossing than those prescribed by the law? Under the record in this case, we are compelled to say that there is evidence which would warrant the jury in answering both of these questions in the affirmative.

The jury may have found that ordinary care would require that a "cross-arm" sign should have been maintained on the east side of the railroad on the north side of the highway, or the "Stop—State Law" sign to have been so elevated as to be visible above the ordinary vehicles using the highway. Therefore, we cannot say that the court erred in refusing to direct a verdict for defendant.

What we have already said applies to defendant's second and third propositions, and we will not here discuss them separately.

Under its fourth proposition, defendant asserts that:

"The trial court erred in submitting the speed of the train in this case as a separate ground of negligence to the jury."

A sufficient answer to this assertion is to quote the instruction of the court on this point, which shows for itself that the speed of the train was not submitted as a separate ground for neglignce, but in connection with the other condition shown to exist.

The instruction, in so far as it relates to the speed of the train, is:

"Gentlemen of the jury, you are instructed

in this case that it is the contention of the plaintiff that the defendant railway company was negligent in its duty toward the plaintiff in this action in that the defendant company operated the locomotive and train in question at an unusually high and dangerous rate of speed; that the railway company did not comply with the statutory requirements in this state in reference to the erection and maintenance of proper signal devices at the crossing in question, and that said railway company was negligent in that signal devices were not maintained at said crossing, which would give the plaintiff and others traveling upon said highway reasonably sufficient warning and that by reason thereof the railway company was guilty of negligence which constituted the proximate cause of the injuries complained of by the plaintiff in this action.

"In reference to the speed of the train, you are instructed that, in your determination as to whether or not the defendant company was careless and negligent in running said train at such a speed as you may find from the evidence the same was operated at the time it approached and crossed the crossing in question, you may take into consideration the location of the crossing and all other surroundings and circumstances whether or not said crossing was an exceptionally dangerous crossing, and from all facts and circumstances in evidence, in this case determine whether or not an ordinarily prudent person, under the same or similar circumstances, would have operated said train at the speed at which you may find said train was operated at and near said crossing in this case."

The general rule is that, in the absence of statute regulating speed of trains in the open country, there is no limit upon the speed at which trains may be run, except that of a careful regard for the safety of trains and passengers. Cross v. Ry. Co.. 120 Kan. 58, 242 Pac. 469; Mulvaney v. N. Y. Cent. Ry. Co., 233 Mich. 350, 206 N. W. 536, citing Robinson v. Ry. Co., 79 Mich. 323.

In the latter case, it was said:

"It is to be presumed that the defendant complied with the provision of the statute in regard to fencing its road, and constructing this crossing with due regard to the safety of persons and property passing over it, and providing its engine and cars with the proper appliances. Having done this, it was entitled to the use of its road for the passage of trains at all times, to increase the speed of its regular trains when behind time, and to run special or wild trains whenever its business required. The law did not limit the rate of speed of its trains. The business of the country demands of railroads rapid transit, both for persons and property. It has nowhere been held

that a speed of even 60 miles an hour is negligence, when a train is running through the country outside of villages and cities, or through a sparsely settled community. It is well known that trains are now being run in many parts of the country at the rate of 50 to 60 miles an hour."

Mulvaney v. N. Y. Cent. Ry. Co., supra, after quoting the above rule, said:

"Like most rules this one has its exceptions.* * *"
,

The exceptions to the rule are recognized in this state as is shown in St. Louis-San Francisco Ry. Co. v. Rundell, supra, wherein the rule stated in 22 R. C. L. 947, is quoted with approval, which is:

"A rate of speed that would be entirely safe under some conditions may, however, be recklessly dangerous under other conditions, and it is generally held that it is for the jury to determine whether or not the speed at which a train was operated was negligent, under all of the circumstances."

It is then said:

"The question of whether 40 miles an hour was an excessive rate of speed to operate a train coasting down grade, without making any noise, without the ringing of the bell or blowing the whistle, when approaching a country crossing, at a place of much travel, where the view from one direction was obstructed, where the crossing was in bad condition, as heretofore described, was a question of fact for the jury, and not such a state of facts upon which all reasonable men would reach the same conclusion."

The general rule should be adhered to, and the exception applied only in a proper case. The question was properly submitted to the jury by an instruction which fairly stated the law, and there was no error therein.

Under the fifth proposition, defendant contends that the court erred in refusing to instruct the jury regarding any duties resting upon the occupants of the car involved in the accident, as they traveled along this road with regard to regulating their speed, keeping their car under control, keeping lookout for crossings or other obstacles or dangerous places ahead of them.

As to the duty of the court in this regard, defendant cites Hines v. Dean, 96 Okla. 107, 220 Pac. 860, wherein it was held:

"It is * * * duty of the trial court to instruct the jury, upon request being made, what duty the law imposes upon the plaintiff, as well as the defendant, and that a breach of that duty is negligence.* * * In no other other manner can the jury be ad-

vised as to the relative duties of the parties."

Defendant in its brief says:

"So far as we know this rule has never been departed from by this court. It is reasonable; it is common sense."

With this we agree.

Defendant complains of the refusal of the court to give at least one of three instructions offered by it, the first of which is as follows:

"You are instructed that it is the duty of a driver of an automobile, driving along a strange road, to keep a sufficient lookout in front of his automobile to observe whether or not he is approaching a railroad track. In this case the evidence shows that there was erected at said crossing a large cross sign, with the words thereon 'Railway Crossing—Look Out for the Cars;' that there was also erected by the side of the road, along which plaintiff was traveling, the statutory sign with large letters thereon, 'Stop—State Law.' You are instructed that if you believe from the evidence that plaintiff was unfamiliar with the road and did not know of the railroad track in that vicinity, then it was his duty to keep such a lookout in front of him so that he could ascertain whether or not he was approaching a railway crossing, and it was his duty to see that the automobile was kept under such control so that the same could be stopped after observing such signs and such crossing before reaching the tracks of said railroad. And you are told, in this connection, that a violation of any of the duties named in this instruction would be negligence on the part of plaintiff."

The instruction was refused and defendant then offered one as follows:

"You are instructed that it is the duty of a party driving an automobile along a strange road to keep a sufficient lookout in front of him and to operate his car at such rate of speed so that such party will be able to bring his car to a stop within the distance that the lights on such car illuminate the road in front of him."

This being refused, the following was offered:

"You are instructed that it is the duty of a driver of an automobile driving on a strange highway at night to exercise ordinary care and attempt to drive his car at such rate of speed so that he can stop in time to avoid objects as they come within the area lighted by his lamps and a violation of this duty would be negligence."

It will thus be seen that defendant sought to have the court direct the jury that some definite and certain thing must be done by plaintiff, with reference to the handling of the car, without regard to whether or not ordinary care and prudence would require the same. As we understand the rule, the duties of travelers upon a highway and those operating a railroad are reciprocal, that is to say, each owes to the other the duty to use ordinary care and prudence in the use of their respective rights of way or place of travel, not to injure or damage the other, and when this is done each has fulfilled his duty to the other. In the absence of positive law, there is no fixed rule as to whether or not any particular act or omission constitutes negligence in any given case. The measure in all such cases is ordinary care and any attempt to limit this measure is beyond the power of courts.

Defendant in its brief asserts:

"The court's instructions may be searched from their beginning to their conclusion, and not one word will be found contained therein defining the duties of these boys to keep a lookout in front of them for railway crossings, or other obstructions, which they might encounter along this road, or to regulate the speed of their car, or keep same under control."

We think this criticism of the court's instructions is not quite justified. Let us see what instructions were given touching the duties of plaintiff. Instruction No. 7 was, in part, as follows:

"Even though the younger brother was driving the car, plaintiff would be chargeable with not only his own negligence, if any, in failing to keep a proper lookout for the oncoming train, or the crossing in front of him, but he is also chargeable with all negligence in this regard, if any, on the part of his younger brother. That is, you are told that if you believe from the evidence that either plaintiff or his younger brother were guilty of contributory negligence in regard to handling of the car or failing to keep a lookout as the car approached the crossing in question, then plaintiff cannot recover in this case, and your verdict must be for the defendant."

No. 8 was, in part:

"You are further instructed that every person of ordinary intelligence is bound to know that the crossing of a railroad track or tracks, over a public highway, where trains are frequently passing, is a place of more than ordinary danger; and it becomes her or his legal duty to use corresponding care and caution to avoid injury."

By No. 11, the jury was told:

"While it was the duty of the defendant to exercise ordinary care in the operation

of its train, it was also the duty of the plaintiff to exercise the same degree of care for his own safety; and if you find from the evidence herein that the plaintiff did not exercise such care. then the plaintiff cannot recover, and your verdict should be for the defendant; and in determining whether negligence on the part of the defendant, or on the part of the plaintiff, was the proximate cause of such injuries, you will apply the same rules and the same principles of law."

Instruction No. 12 was:

"You are further told that, in determining whether or not the plaintiff was negligent in going upon or up to the railroad at the time of the injuries complained of in his petition, you will take into consideraton the surrounding circumstances as to whether or not the railroad was so conspicuous as to attract the attention of a person approaching the same and exercising ordinary care before going upon it, and also whether an approaching train coming from the direction in which the defendant's train approached at the time of the collision, could be seen for any considerable distance by a person exercising ordinary care in approaching said track as the plaintiff approached it and in time to stop the car before going upon the track; and, in this connection, you are further told that, if you find from the evidence herein that the plaintiff before going upon defendant's track on which the train was approaching could have, with the exercise of ordinary care, seen the approaching train, or if he could have, with the exercise of such care, heard the same as it moved along the track, and that she failed to look and listen and failed to use the care which an ordinarily prudent person would have exercised under like circumstances, then and in that event plaintiff cannot recover herein, and your verdict should be for the defendant."

No. 10 was, in part:

"Unless plaintiff establishes by a fair preponderance of the evidence that the collision was caused by some of the acts of negligence charged in plaintiff's petition and submitted in the instructions, and it is further shown by the evidence that the plaintiff was free from negligence contributing to the damage which the plaintiff is here seeking to recover. If you find and believe from the evidence that the collision was due to an unavoidable accident, then, in that event, your verdict should be for the defendant."

Nos. 10 and 12 were very liberal towards defendant.

We think the instructions, as a whole, were very fair to defendant, and that there was no reversible error therein.

From the whole case, precluded as we are by the Constitution from passing upon the question of contributory negligence, we conclude that the judgment should be affirmed.

BENNETT, HALL, HERR, and REID, Commissioners, concur.

By the Court: It is so ordered.

Note.—See under (1) 22 R. C. L. p. 999; R. C. L. Perm. Supp. p. 5275. (2) 22 R. C. L. p. 990; R . C. L. Perm. Supp. p. 5274 (4) 22 R. C. L. p. 948; R. C. L. Perm. Supp. p. 5271.