### GULF, C. & S. F. RY. CO. v. NAIL.

No. 20825. Opinion Filed April 5, 1932.

Rehearing Denied April 26, 1932.

Rainey, Flynn, Green & Anderson, for plaintiff in error.

Sigler & Jackson and J. H. Hays, for defendant in error.

SWINDALL, J. This is an appeal from the district court of Love county, Okla., wherein plaintiff, defendant in error herein, recovered judgment against defendant, plaintiff in error herein, in the sum of $5,000 and costs, for damages resulting from an injury received by said plaintiff on the 28th day of May, 1928, when a railway box car owned and operated by defendant through its employees struck plaintiff, knocked him down, and rolled over his foot, crushing it so that it was necessary for him to have it amputated.

The plaintiff predicated his claim to damages upon the alleged negligence of defendant's employees.

The testimony shows that the Gulf, Colorado & Santa Fe Railway Company's line runs north and south through the city of Marietta, Okla., and that Main street crosses it at right angles. There is more than one track at the point of crossing. The business part of the city and most of the residential part are west of the tracks; a substantial residential section lies east of them. South of the street crossing on the west side of the tracks is the passenger station, and just south of the street crossing on the east side of the tracks is the freight depot. Just north of the street crossing on the east side of the most eastern track is a pump house. This pump house is about 90 feet from the north edge of the street, and is about 8 feet from the east rail of the track. It faces west toward the track, and there is a door in its center. There is also a door on its north side. And there is a railing a few feet in front of it on its west side inclosing a flower bed. South of the pump house is a concrete water tank about four feet high and south of that is a flower garden, both of which are between the pump house and the street. Directly across from the pump and between the east track and the main line track is a steel water tank. Near this is a water crane. The east track is a side track which branches off from the main line some distance north of these improvements, runs down past a cotton platform, past the pump house and between it and the steel water tank, across the street and in front of the freight depot where there is a loading platform. On the west side of these tracks, north of Main street and fronting upon it is the post office.

There was some conflict of testimony with respect to foot paths crossing these tracks north of the street crossing, and with respect to the number of persons using them, but it is clear that there were at least two paths used by a substantial number of persons for the purpose of crossing the right of way when going to and from the eastern part of town to the business district. There was one path starting from a point north of the street and near the post office and crossing the tracks to the north corner of the pump house then continuing in a northeasterly direction. There was another path starting from the street at its junction with the east track and proceeding on the east side of this track directly "up the switch" and in front of the pump house to the north corner of the pump house where it joined with the first described path.

The plaintiff, Perry Nail, testified that on the 28th day of May, 1928, the date of the accident, he went a short distance north from the post office, then crossed the tracks going beyond the east track; that he then turned back and started down the north and south path intending to go into the front door of the pump house. He testified that his purpose in going to the pump house was to sell someone in there his needles and deaf and dumb cards. He had moved only a few feet down the track when he was struck in the shoulder by the moving box car, was knocked down, and his foot was crushed. When struck he was about a foot or two feet from the track and had his back to the cars. He testified that he looked for cars when he crossed the tracks going east, that he thought he saw some box cars, but did not see any engine, and

that the cars were not moving. He testified that when he turned back to go down the side of the track to the pump house door he did not look north for cars. He further said that there was no obstruction to prevent him from seeing the cars to the north had he looked. That he was deaf and dumb, and that he could not have heard the whistle of an engine nor the ringing of an engine bell, nor could he have felt the vibration of either.

On the day of the accident the train crew with defendant's train arrived in Marietta at about 7:40 in the morning, stopped south of Main street, then went up to the switch track here involved, moved in on it down to the freight depot, picked up some cars, pulled out onto the main track, switched out some cars, then moved back onto the switch track. intending to place some cars at the freight depot. As the train was backing south down this track toward the freight depot the plaintiff was struck.

At the time of the accident the train conductor was standing on the north end of the freight depot platform south of Main street; the engineer was at his post in the engine cab on the east side of the engine, the fireman was in the engine cab on the left side; the two brakemen were standing on the top of the rear car of the train. It was this car that struck plaintiff. Brakeman Allen was standing 6 or 7 feet from the end of the car, and Brakeman Whelock was standing 6 or 7 feet behind Allen. The engine had attached at this time seven cars; the whistle had been sounded for a crossing a block north but not for the Main street crossing; the bell was ringing; the train was moving 5 or 6 miles per hour. Brakeman Allen testified that he saw the plaintiff Nail just before the car upon which he was riding got to the pump house, that Nail was 10 or 15 feet from the track and was walking in a southwestern direction toward the track, and that the car was a car's length from Nail's position. He testified that he yelled, but that Nail paid no attention to him, and that he then gave the signal to stop the train. That the car was 3 or 4 feet, or "5 or 6 feet, maybe 4 or 5 feet" from Nail when he gave the signal. Brakeman Whelock testified that he also saw Nail when the car was a car's length away, and that he holloed and immediately gave the signal to stop. Other witnesses testified that the brakemen began yelling at Nail when the car was a car's length or half-car's length away from him. The conductor testified that the cars were 10 or 15 feet away from Nail when brakeman Allen gave the signal to stop, and that Allen gave the signal and called at about

the same time. All of the witnesses agreed that there was no obstruction to prevent Nail from seeing the train. The engineer testified that part of the way down this switch track a slight curve interfered with his view down the east side of the train, but said that at the point where Nail was struck and for about two car lengths above it he could have seen Nail, but that he did not. That the first he knew he received the signal from Allen to stop; that this was about a half car's length from the point where Nail was struck. And that he applied the brakes immediately and stopped as soon as possible. The testimony is uniform that the train moved 60 to 80 feet beyond the point of the accident before it came to a stop. It is less uniform, but seems clear that the train was moved north after the accident to a position above that where Nail was found. There is some testimony with respect to the kind of brakes on the train, it being admitted by the train crew that the compressed air brakes for each car were not coupled, and that the brakes used in stopping the train were the "emergency" brakes; it was also admitted that these were not quite so effective. and that the train could have been stopped in a slightly shorter distance if the air brakes had been coupled. Many persons were attracted by the yelling, and Nail was found a few feet south of the west door of the pump house lying holding his leg with his foot mashed. Some of the persons attracted put Nail into a truck and he was carried to the office of the physician and surgeon for the railway company in Marietta, a Dr. Autry. He was taken there sometime between 8 and 9 o'clock in the morning. His foot was bandaged and he was given a hypodermic and allowed to remain in this office until about one o'clock in the afternoon before his foot was amputated, though it is apparent that the doctor knew that an operation would have to be performed. There is much testimony with respect to a release signed by the plaintiff just a few minutes prior to the time when the operation was performed, but since in our opinion this case must be reversed, it will not be necessary to consider that evidence.

The case, as it stands upon this appeal. raises two broad questions, the duty of care owed by defendant to plaintiff, and whether defendant fulfilled such duty. The first involves an analysis of the status of the plaintiff at the time he was hurt, whether a licensee or trespasser, and of what duty the law places upon defendant with respect to persons occupying such status. We might consider at length whether or not plaintiff was a trespasser, but as in

our opinion it is necessary to reserve the case, even though we treat him as a licensee and hold the defendant to the higher duty owed licensees, we will leave that question open. This, then, brings us to a determination of the legal duty owed by the employees of a railroad company in operating its trains to a licensee upon the railroad right of way at a point where the public has for years openly and notoriously used the tracks for a passageway. The duty was stated in the second syllabus paragraph of the case of Wilhelm v. Missouri. O. & G. Ry. Co., 52 Okla. 317, 152 P. 1088, decided 1915, as follows:

"The rule as stated in A., T. & S. F. Ry. Co. v. Cogswell, 23 Okla. 181, 99 P. 923, 20 L. R. A. (N. S.) 837, to the effect that a railroad company is liable only for willful and wanton injuries which may be inflicted upon a licensee, is not followed. But it is held that, regardless of the fact that the person injured was a bare licensee upon the track of the railroad company, the company is bound to exercise that degree of care and watchfulness to protect human life that is commensurate with the probability that persons may be upon its track at any given point. And whether that has been done or not, under proper instructions, is a question for the jury."

In the body of the opinion the court quoted with approval from Swift v. Staten Island R. T. R. Co., 123 N. Y. 645, 25 N. E. 378, as follows:

" 'The legal principles applicable to the facts appearing here have been frequently enunciated by this court to the effect that, where the public have, for a long time, notoriously and constantly, been in the habit of crossing a railroad at a point not in a traveled public highway. with the acquiescence of the railroad company, such acquiescence amounts to a license, and imposes a duty upon the company, as to all persons so crossing, to exercise reasonable care in the running of its trains so as to protect them from injury.' "

In the Wilhelm decision it was pointed out that the court in stating the duty in the Cogswell Case, cited therein. was indulging in dicta because in that case the plaintiff was held to be an invitee. The rule announced in the Wilhelm Case has not since been departed from in so far as it concerns the duty owed by a railroad company to licensees upon its right of way at a point where a license is implied to the whole public because of long and open use. As applied to such case we believe it to be a wholesome rule, and, therefore, follow it in this case.

Our conclusion leaves for decision the second question raised. whether defendant failed to fulfill its duty, which question if determined adversely to plaintiff is decisive of the case. The principle upon which this court has authority to determine such question adversely to plaintiff is stated in the first syllabus paragraph of the case of Gulf, C. & S. F. Ry. Co. v. Harpole, 111 Okla. 301, 239 P. 609, as follows:

"It is well settled in this jurisdiction that if there is any competent evidence reasonably tending to support the verdict, the same will not be disturbed on appeal, and where the evidence is conflicting, this court will not examine the evidence for the purpose of determining the weight thereof; but where a demurrer is filed to plaintiff's evidence and an instructed verdict is requested, this court will examine the record, and if upon such examination it is found there is no evidence reasonably tending to support the verdict and judgment, such judgment will be reversed."

See, also, Complete Oklahoma Digest, vol. 1, Appeal and Error, p. 304 et seq.; Oklahoma Civil Digest, vol. 1, Appeal and Error, p. 239.

The plaintiff sets out in his brief those portions of the evidence which he considers sufficient to support the verdict. His contentions are stated at page 58 of his brief:

"The jury in this case certainly had a right to pass upon the question of whether the bell was rung, or whether the whistle was blown or whether or not the train crew was keeping a lookout for the public. and whether or not there were any brakemen looking out on the rear cars. In our judgment the jury were highly justified in considering, from all the testimony herein introduced by the plaintiff and by the defendant. that the train crew did not see the plaintiff until the instant immediately before he was struck."

To demonstrate that there was sufficient evidence to go to the jury to show that there were no brakemen on the rear car, plaintiff quotes from the testimony of certain witnesses: Mr. T. R. Thompson to the effect that he did not see any brakemen upon the train; Mr. J. N. Jones to the effect that when he arrived the box cars were being pushed north and that the train crew was with the train; and Mr. J. K. Davis, one of the first men on the scene after the accident, as follows:

"Q. Did you see the brakemen? A. No. sir. I saw the conductor. * * * Q. Did you see any brakemen on the rear end? A. No, sir. don't remember anyone except the conductor."

His contention in this matter is easily disposed of. Mr. Thompson testified that he did not even see the cars because he was

not paying any attention to anything except the injured man. Mr. Jones' testimony quoted does not have any tendency to prove that there were no brakemen on the rear car at the time of the accident. The record, on page 74, shows Mr. Davis' testimony to have been as follows:

"Q. Did you see the brakemen? A. No, sir, I saw the conductor. * * * Q. Did you see any brakeman around there? A. No, sir, don't remember anyone except the conductor. Q. Did you see the brakeman off up at the train? A. I don't remember whether there was or not."

It is too clear for argument that this was no sufficient evidence from which the jury could find that there were no brakemen on the rear car at the time of the accident. See 10 R. C. L. p. 1010; 12 Ann. Cas. 1031, and note; 18 Ann. Cas. 635 note.

The contention that the train crew were not keeping a proper lookout and therefore "did not see the plaintiff until the instant immediately before he was struck," is slightly more difficult to settle. To support this contention the plaintiff calls attention to and quotes portions of the testimony of four witnesses, the pumper, Robert Kerr, Hosey Jones, and the engineer. The substance of the quoted testimony of the first three is that their attention was attracted by the "hollering" and that upon looking they saw Nail just before he was struck. From this the plaintiff infers, and contends that the jury was entitled to infer, that the brakemen yelled instantly upon seeing Nail and that he was struck within a few seconds thereafter, and that, therefore, the brakemen were not keeping a proper lookout. When we again resort to the record we find no such inference was justified from the testimony of these witnesses. The pumper testified that the yelling attracted his attention, that he heard someone yell several times, that he looked up from his work and looked south toward the street crossing, then looked back to where he saw Nail coming, and in answer to the question "What did you see?" he said he saw the cars hit the man. The engineer said that he did not see Nail and did not know how long it was after Allen signaled before the accident occurred. Robert Kerr testified specifically that when he first heard the calling the brakeman was a car's length from Nail. Hosey Jones stated when he was first attracted the men making the noise were a car's length or half car's length from Nail's position. We can see nothing in this evidence to sustain plaintiff's contention, but on the contrary think that that part of it which has any probative force rebuts the inference contended for.

Six persons testified regarding the distance between the rear car of the train and Nail's position when the yelling began. The conductor and Hosey Jones were standing upon the freight depot platform south of the street. The conductor said that the car was 10 to 15 feet, or 20 to 25 feet, from Nail; Hosey Jones said that it was a car or half car's length from him. The two brakemen were on top of the car. They said that it was a car's length from Nail. Samuel Mayes, who was east of the tracks and south of the pump house, and Robert Kerr, who was standing by the water crane, each said that the rear car was a car's length from Nail when the calling began. We think that this testimony, in the absence of any physical fact or testimony contrary to it, established the distance beyond dispute.

Plaintiff next contends that defendant's answer, which was introduced in evidence, contains an admission as follows:

"That the plaintiff went in front of a moving string of cars without the knowledge or consent of this defendant in such a manner that it was unknown to the employees operating said string of cars, and that it was impossible to stop the movement of the cars in time to avoid said accident."

And that this pleading was drawn by defendant's attorneys after receiving written statements of fact from his witnesses. That, therefore, the jury was entitled to believe that defendant's employees never did see plaintiff and for that reason were unable to avoid striking him. The jury was entitled to consider this statement in the pleadings, but they were bound to consider with it all factors affecting its value. Lane v. Choctaw, O. & G. R. Co., 19 Okla. 324, 91 P. 883. Under plaintiff's view this evidence arose out of the written statements made by certain of defendant's witnesses. These same witnesses were all present and testified at the trial. Every one of them testified positively and unequivocally that someone on the rear end of the train was "hollering." One of these witnesses was a disinterested person, and another had only a slight interest, he had formerly worked for the defendant company. Where a witness is disinterested his testimony is to be taken as true and will justify a directed verdict unless there is some factor to discredit such testimony, and it will stand as against a mere suspicion of its falsity. 10 R. C. L. 1006; 4 Ann. Cas. 980, and note. The only discrediting circumstance here was the admission pleaded. This was made in the form of a contention by the attorneys in attempting to set out a defense. Some states go so far as to refuse to allow such an ad-

mission on the ground that it is not an admission of the party, but only a "mere suggestion of counsel." See 10 A. L. R. 23, and note. Numerous things can account for the statement other than that its recitation conformed to the facts. The jury was bound to consider all of these uncertainties. In view of these uncertainties and of the positive testimony of all of the witnesses, including disinterested ones, we think this was not sufficient evidence upon which the jury could find that defendant's employees did not see Nail.

"A jury cannot be permitted to find there is evidence of a fact when there is not any. * * * Nor can he do so when the evidence is too slight or trifling to be considered and acted upon by a jury. The evidence must have some legal weight." Connor v. Giles, 76 Me. 132.

See, also. Improvement R. Co. v. Munson, 20 L. Ed. 867; 2 L. R. A. 340; 4 L. R. A. 776-8; 26 R. C. L. p. 1070; Complete Oklahoma Digest, vol. 4, "Trial," and vol. 1, "Appeal and Error."

There is one other question of fact in this case which requires settling before we go into the sufficiency of the established facts to support a finding of negligence. The plaintiff states in his brief that plaintiff testified that:

"He crossed the track and went east about four feet and then turned south to go into the pump house to sell the pumper some wares, and as he walked down the track, he had gone about two feet when he was struck by the cars."

On the other hand. it is said that before plaintiff was struck he was in a position of complete safety on the north side of the pump house, and when first seen was approaching the track moving in a southwesterly direction. Plaintiff's view receives its strongest support from three answers given by plaintiff. Those questions and answers were as follows:

"Q. Did you have an accident on that day, and if you did, how did it happen? A. Yes. sir, I crossed the railroad and was going to the pump house with my back to the north down a little path to the pump house when the train struck me. * * * Q. How far east from the east track did you go? A. About two feet. * * * Q. What was to prevent you from seeing the cars? A. I don't know. Nothing to prevent me from seeing the cars, I was very cautious in crossing the track, I had looked out for cars and turned on my way toward the pump house."

We think. however. that the inference is not justified from this testimony when considered in connection with other portions

of plaintiff's testimony. In answering the first and third questions the plaintiff's attention was not directed to whether or not he had gone beyond the tracks, then turned back, and it seems reasonably clear that he did not have that point in mind. The record wherein the second answer appears more fully quoted is as follows:

"Q. Did you go into the pump house when you crossed the tracks? A. No, sir. Q. Were you on the north side of the pump house? A. Yes, sir. Q. Is that where you turned and started south? A. Yes, sir. Q. How far east from the east track did you go? A. About two feet. Q. How long were you there at the north end of the pump house? A. Just a minute."

Again, the plaintiff was asked:

"Q. Where did you intend to go when you went across to this point (indicating); why did you turn around and come back is what I want to know. after you got up here to the corner of the pump house?"

And he answered:

"A. I thought there was someone in there and I would go in there and sell them something."

On further cross-examination the plaintiff answered as follows:

"Q. If you looked for trains, which way did you look? A. Toward the door of the pump house. Q. Which way did you look, which direction? A. South. Q. State whether you looked north about the same time? A. No. I looked south when I left the pump station. Q. Before that, had you looked north? A. No. I did not look up and down then. I did look up and down the track before I crossed over to the track."

And again the plaintiff said:

"A. About the distance Mr. Jackson is from this line, I was in the neighborhood of eight or ten feet east of the east rail when I turned to go back south."

There was a plat introduced in evidence which shows that the northwest corner of the pump house was eight feet from the east rail. A picture shows an iron railing, enclosing a flower plot in front of the pump house, which must have set three feet from the pump house proper. The conductor testified that when he first saw Nail he was 7 or 8 feet from the track and was traveling toward it from the northwest corner of the pump house. Brakeman Allen said Nail was 10 or 15 feet from the track when he first saw him; Brakeman Whelock said he was 15 feet and was moving southwest; and Samuel Mayes said he first saw Nail coming around the north end of the pump house bearing west. We think that this testimony of defendant's witnesses was not contradicted by plaintiff's testimony but

was corroborated by it, and that there was nothing in the record which would have justified the jury in finding otherwise. See authorities cited supra.

The foregoing analysis of plaintiff's contentions gives us a definite body of facts from which to determine whether the question of negligence was properly one for the jury. After a careful consideration of these facts we fail to find any act on the part of defendant's employees wherein they failed to exercise due care. No contention is made that backing the train down the track was in itself negligent, nor that it was being moved at an improper rate of speed. Whether the whistle was blown or bell rung was immaterial because under the circumstances of this case, the plaintiff having testified that he could not have heard either, such failure could not have been the proximate cause of the injury. See Johnson v. Rio Grande Western R. Co., 19 Utah, 77. 57 P. 17, and the cases on proximate cause cited post. However, we think it established that the bell was being rung. That the engineer acted promptly in applying the brakes after receiving the signal to stop is not disputed. The primary question is whether the employees were keeping a proper lookout, saw plaintiff as soon as they should have, and acted promptly and properly thereafter. The engineer stated that he could have seen Nail when the rear car was two car lengths from him, but that he did not see him. Generally an engineer's attention does not have to be centered entirely upon discovering persons on the tracks, but if under the circumstances of this case we hold that it should have been, we think that he was justified in depending upon the brakemen. The two brakemen, and particularly Allen, were the persons upon whom the duty to keep a proper lookout, to warn persons, and to signal the engineer, primarily rested. We have already concluded that they saw Nail when they were a car or half car's length from him, and that he was then 7 to 10 feet from the tracks in a position of complete safety. They were entitled to assume that he was a person in possession of all of his faculties. Green v. Los Angeles Terminal R. Co., 143 Cal. 31, 76 P. 719, 69 P. 694; Frazier v. South, etc., R. Co., 81 Ala. 185, 1 So. 85, 60 Am. Rep. 145; Tyler v. Sites, 90 Va. 539, 19 S. E. 174; and 33 Cyc. 803, note 42. Assuming that, they would suppose, and were entitled to suppose, that he had either seen the train or had heard it, or would see or hear it, and would remain in a position of safety. Chicago, R. I. & P. Ry. Co. v. Barton, 59 Okla. 109, 159 P. 250; St. Louis, I. M. & S. R. Co. v. Gibson, 48 Okla. 554, 150 P. 465; Green v. Los

Angeles Terminal R. Co., supra; and Dickinson v. Cole, 74 Okla. 79, 177 P. 570. They were not, then, bound to signal for a stop immediately upon seeing him. Mobile, etc., R. Co. v. Coerver, 112 Fed. 489, 50 C. C. A. 360; Illinois C. R. Co. v. Ackerman, 144 Fed. 959, 76 C. C. A. 13; Asbury, Smith's Adm'r, v. Cincinnati, N. O. & T. P. R. Co., 41 L. R. A. (N. S.) 193, 146 Ky. 568, 142 S. W. 1047. They were further justified upon first realizing that he was likely to become endangered in supposing that a warning cry would serve to keep him away from the tracks. When they saw this fail, they were, of course bound to give the signal to stop the train. Allen said he signaled when 3 or 4 feet from Nail; others testified he signaled much sooner, but granting that his version is correct, we cannot see that his negligence, if he was negligent, proximately caused the injury. If he first saw Nail when a car's length from him, and when Nail was 7 to 10 feet from the track, he would not have been required to signal immediately; the car would have been closer to Nail and Nail would have been closer to the track before that duty arose. The evidence shows that it required 60 to 80 feet to stop the train, and that with the best possible brakes it would have required only a slightly shorter distance. Therefore, had Allen signaled at the time when he should have under the view most favorable to plaintiff, such signal could not have prevented the accident. Thus, any negligence in that regard was not the proximate cause of the injury and could not have been the basis of recovery. Chicago, R. I. & P. R. Co. v. Barton, supra; St. Louis, I. M. & S. R. Co. v. Gibson, supra; Davis v. Lawson, 118 Okla. 94, 246 P. 853; Ft. Smith & W. R. Co. v. Jones, 63 Okla. 228, 163 P. 1110; Bosko v. Dela., etc., R. Co., 91 Hun (N. Y.) 320, 36 N. Y. S. 261; Crystal v. Troy. etc., R. Co., 124 N. Y. 519, 26 N. E. 1103.

Plaintiff further contends in effect that the jury were entitled to determine from all the circumstances what precautionary measures the defendant was required to take; that is, the number and kind of warning signals required, or whether or not a man should have been stationed at the crossing. This is true as a statement of the general rule of law, but it, too, is subject to the limitation that where no reasonable man would require more than was done, it becomes a matter for the court. Wichita Falls & N. W. R. Co. v. Groves, 81 Okla. 34, 196 P. 677; St. Louis-San Francisco R. Co. v. Robinson, 99 Okla. 2, 225 P. 986; St. Louis-San Francisco R. Co. v. Thompson, 139 Okla. 142, 281 P. 565; St. Louis-San Francisco R. Co. v. Prince, 145 Okla. 194,

291 P. 973; and Grand Trunk Ry. Co. v. Ives, 144 U. S. 408, 36 L. Ed. 485.

To sustain his position plaintiff relies heavily upon the case of Webb v. West Jersey & S. S. R. Co. (N. J. Law) 126 Atl. 659, in which the facts were similar to those in the case at bar. There Miss Webb was driving an automobile to the railroad station of the defendant company. She was proceeding down a private road constructed for that purpose. A spur track had been laid between the main highway and the railroad station, and crossed this private road. The automobile was struck as it was passing over the crossing by defendant's train which was backing down to the crossing. Miss Webb claimed she observed the train and that it was standing still; defendant's evidence showed it was continuously in motion, and that it was running at a speed of from 5 to 10 miles an hour. The engine bell was being rung, and there were two men on the top of the rear car who observed Miss Webb and "let out a holler," but she did not stop. The court held that the question of negligence was one for the jury on the the theory that additional precautions may have been reasonably necessary for the safeguarding of persons who were intending to pass over the crossing.

That case is distinguishable from the case at bar, and we content ourselves with so doing without passing upon its soundness under the decided cases in this jurisdiction. In the Webb Case the injury occurred at a road crossing and the plaintiff was driving an automobile; in the present case the injury occurred at a path and the plaintiff was walking. The rate of speed with which an automobile can come upon the tracks, the inability of the driver to stop it in a short distance, the noise incident to running it, its structural obstructions to the driver's view, and the attention required in its driving, all combine to make the kind and amount of warning necessary different from that required in the case of a person walking. As compared to the latter, the driver of a car cannot so readily see a brakeman on top of a train, he needs warning at an earlier time to enable him to stop, he cannot so easily hear a warning cry nor the noise of the train itself, and his attention is less likely to be drawn to the approaching train. Because, therefore, the court found in the Webb Case that there was sufficient evidence to go to the jury, it does not follow there was sufficient evidence in this case, even if we were bound by the Webb decision.

The rule of law applicable to these cases in the state of Oklahoma has been announced in the following decisions: Wichita Falls & N. W. R. Co. v. Groves; St. Louis-S. F. R. Co. v. Robinson; St. Louis-S. F. R. Co. v. Thompson; and St. Louis-S. F. R. Co. v. Prince, all cited supra. The second syllabus paragraph of the Prince Case reads as follows:

"Where a crossing is unusually dangerous, because of its peculiar construction and situation and the amount of traffic passing thereover, it is the duty of the railway company to exercise such reasonable care and take such precautions as common prudence would dictate, taking into consideration the nature of the crossing; and whether or not a given crossing is unusually dangerous is a question for a jury, unless only one conclusion could be drawn by all reasonable men from the evidence relative thereto."

In the body of the opinion the court quotes with approval from the case of Central Passenger Ry. Co. v. Kuhn, 86 Ky. 578, 6 S. W. 441, 9 Am. St. Rep. 309, as follows:

"It seems, however, that before a jury will be warranted in saying, in the absence of any statutory direction to that effect, that a railroad company should keep a flagman or gates at a crossing, it must be first shown that such crossing is more than ordinarily hazardous; as, for instance, that it is in a thickly populated portion of a town or city; or that the view of the track is obstructed either by the company itself, or by other objects proper in themselves; or that the crossing is a much traveled one, and the noise of approaching trains is rendered indistinct, and the ordinary signals difficult to be heard, by reason of bustle and confusion incident to railway or other business; or by reason of some such like cause; and that a jury would not be warranted in saying that a railroad company should maintain those extra precautions at ordinary crossings in the country."

We do not think that the crossing involved in the case at bar was such as was contemplated by the writers of the opinions cited above. There was nothing "unusually dangerous" about this crossing, it was free from obstruction and a walker upon the path could see a train in ample time to avoid danger; there was nothing to confuse a person in passing at this point, there was no undue amount of travel over the path, and there was nothing to indicate that ordinary signals would not be entirely sufficient. It seems to us that under the circumstances of the present case, the defendant company took all the precautions that prudence would dictate, that there was nothing to show that the crossing was "unusually dangerous," and that "only one conclusion could be drawn by all reasonable men from the evidence relative thereto."

The evidence was that when the employees of the defendant saw the plaintiff approaching a place of danger, they gave him all proper and necessary warning, and had plaintiff possessed his sense of hearing he would have observed such warning and the natural assumption is that he would have stopped and not sustained an injury. The employees of defendant did not know that the plaintiff was deaf and had the right to assume that he would observe the signals of warning given. As soon as it reasonably appeared to the employees of the defendant that the plaintiff was not going to heed the warning given, the brakemen signaled the engineer to stop the train and the engineer used ordinary care in attempting to do so. Hence, it is clear that the injury to the plaintiff was not the result of a breach of duty of defendant. There was no breach of duty.

We, therefore, hold that there was no evidence from which the jury were entitled to find that the defendant company did not take all of the precautions that a person acting with ordinary prudence under the circumstances should have taken.

The rules of law announced in this case are fully sustained by numerous decisions of this court found in the case of City of Tulsa v. Harman, 148 Okla. 125, 126, 299 P. 470, 471, and no useful purpose would be served by quoting the same herein.

It follows from the foregoing that there was no competent evidence reasonably tending to support the verdict and judgment. It appears that on a retrial no additional testimony would be available to strengthen the case of the plaintiff. The cause is therefore reversed and remanded to the district court of Love county, with directions to dismiss.

CLARK, V. C. J., and RILEY, HEFNER, CULLISON, ANDREWS, McNEILL, and KORNEGAY, JJ., concur. LESTER, C. J., absent.