E. W. HUTCHISON v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellant.—72 S. W. (2d) 87.

Division Two, May 17, 1934.*

*NOTE: Opinion filed at September Term, 1933, February 23, 1934; motion for rehearing filed; motion overruled May 17, 1934; motion to modify opinion filed; motion overruled at May Term, May 17, 1934.

*E. T. Miller, Mann, Mann & Miller* and *Leo H. Johnson* for appellant.

84

*F. P. Sizer* and *H. A. Gardner* for respondent.

COOLEY, C.—Action for damages for personal injuries received by plaintiff when struck by a train on defendant's railroad, through defendant's alleged negligence, at a highway crossing near Dawson, Oklahoma. From a judgment for plaintiff for $20,000, defendant appeals. Plaintiff's petition contained several specifications of negligence only two of which were submitted, viz., excessive speed of the train and failure to give statutory or other warning as it approached the crossing. Defendant's answer denied the allegations of negligence and pleaded that plaintiff had been guilty of contributory negligence in that he failed to bring the automobile truck in which he was riding to a complete stop before driving upon the crossing, as it is alleged a statute of Oklahoma required him to do; failed to look or listen for an approaching train; failed to stop in a place of safety after he discovered or by the exercise of ordinary care could have discovered the approaching train; and that in approaching the crossing he drove his truck at a negligent rate of speed.

Defendant did not have a flagman or watchman nor maintain an electric or other signaling device at the crossing in question. Plaintiff's evidence tended to show that the train which struck him did not give the statutory warning by bell or whistle nor any warning or signal of its approach. Defendant's evidence was to the contrary. It is virtually conceded that plaintiff made a case to go to the jury unless he should be declared guilty of contributory negligence as a matter of law. On that question there is sharp controversy. In stating the facts we therefore give the evidence bearing on that issue in the light most favorable to the plaintiff.

Defendant's main line track, at the place where the collision occurred, runs in an easterly and westerly direction and intersects, at grade and practically at right angles, the public highway known as Sheridan Road, which runs north and south. At the time in question Sheridan Road was paved to a width of eighteen feet and was a much-used highway. Plaintiff was on the pavement, going south, in a 1927 model Chevrolet truck which had been recently "overhauled" and had had a new motor and new tires installed. It ran smoothly and without noise. The brakes were in good condition. Originally the cab in which the driver sat had doors at each side of the driver's seat but these had been taken off so that at the time in question the driver had an open view to either side. The train that struck plaintiff was a passenger train going east, running at a rate

of speed estimated by several witnesses at fifty to sixty miles an hour. Since plaintiff approached the crossing from the north and the train from the west, obstructions near the crossing west of the highway and north of the railroad track play an important part in this controversy.

West of the highway and fronting thereon there was a brick building and lumber yard. The east end of this building was fifty feet west of the pavement. South of and against the brick building there was a shed twelve feet wide, its east end coming to within thirty feet of the east end of the brick building, therefore eighty feet west of the pavement. North of and against the brick building there was a similar shed. The brick building is generally referred to in the record as being fifty feet in width north and south, though plaintiff's witness Shelton, a civil engineer who had made measurements thereabouts, testified that the combined width of building and sheds was eighty-six feet. The south wall of the south shed, the side next the railroad track, was approximately twenty feet north of the north rail of defendant's main line track. From the southeast corner of that shed a picket fence seven feet high, with upright pickets three or four inches wide and about that far apart, extended south six feet, thence east parallel with the railroad track about thirty feet to the cattle guard or the wing fence thereof on the west side of the highway, thence north six feet to a brick pillar of the same height standing beside a driveway going back into the shed. The east and west portion of the picket fence, paralleling the railroad, was fourteen feet north of the north rail of the main line. The highway must be wide at that point as it seems to be conceded that the front, east, end of the brick building was fifty feet from the pavement and that the six-foot north and south extension of the picket fence at its east end, which tied onto the wing fence of the cattle guard, was on the same line as the east end of the building. A traveler on the highway could not practically see *through* the picket fence a train approaching from the west because he would have to look through two lines of fence, either the two north and south extensions at the east and west ends or the north and south extension next the highway and the east and west portion paralleling the railroad. Shelton testified that from a point on the pavement fifteen to seventeen feet north of the railroad track a person seated in an automobile could not see a train coming from the west "very far," looking over the top of the fence. Another witness, Blair, who had made observations seated in an automobile, testified: "Q. Don't you know in riding along in an automobile or truck you can see a train over the top of that picket fence? A. Not very well there, Mr. Mann." He further said the top of the fence was higher than the head of a man seated in an automobile but did not say how much higher.

Between the shed adjoining the south side of the brick building and defendant's main line track there was a spur track, evidently maintained for delivering lumber to the lumber yard and shed. A witness for defendant said the lumber yard was on defendant's right of way. The spur did not come to the highway. Its east end, according to Shelton, was 147 feet west of the pavement. Shelton said the south rail of the spur track was about ten feet north of the north rail of the main track. Blair, an apparently intelligent witness, who was present and observed the *locus in quo* when Shelton made his measurements but did not himself make measurements, estimated the distance between the main and spur tracks at about six feet. He estimated the distance from the east end of the spur track to the pavement at not to exceed seventy-five feet.

At the time of the collision two box cars were standing on the spur track. Plaintiff was not conscious of having seen or noticed the box cars, he only knew his view to the west was shut off, but their presence is definitely established by the testimony of defendant's witness, Smith. Their exact location with reference to the east end of the spur is not shown but from Smith's testimony they must have been near it. They were between him and the crossing and he was stacking lumber "not quite half-way to the west end of the yard," which he estimated was about 660 feet long east and west. He said once he was about 231 feet west of the crossing (pavement). Elsewhere in his testimony he gave the distance as 331 feet. But he testified he had stepped the distance from the crossing to the point where he stood and it was "two hundred and thirty and some odd feet . . . according to my stepping. I counted it three feet to a step and it was seventy-seven steps." Absent cars on the spur track Shelton testified that, sitting in an automobile on the pavement with its front end seven feet from the north rail he could see the railroad track westward, looking to the south of the picket fence, a distance of 150 feet. He estimated the distance from the front end of his Buick car to his seat behind the steering wheel at about ten feet, which would put him when he made the observation about seventeen feet from the rail. Several other witnesses testified that, approaching the crossing from the north, one would have to be "right up at the track," "up close to the rail," before he could see beyond the permanent obstructions a train coming from the west. There was evidence that the track is somewhat down grade from the crossing west. Blair estimated it was two feet lower at the west end of the lumber yard, some 700 feet west of the crossing according to Smith's estimate, than at the crossing. That fact might tend to decrease the chances of seeing an approaching train by looking *over* the picket fence.

Let us examine briefly the situation with reference to visibility of the railroad from points on the highway north of the lumber yard.

There was evidence that there were lumber stacks high enough to obstruct the view extending back of the brick building to the west end of the yard. The pavement was slightly down grade for about 500 feet northward from the crossing, the fall being about two feet in a hundred feet of distance. A witness, Wheeler, who was following plaintiff in an automobile and 125 to 150 yards behind him as plaintiff approached the crossing, testified that when about 150 yards north of the crossing he, Wheeler, saw the train for a short distance. The lumber yard then cut off his view of it. It is not quite clear whether he looked to the west of the lumber stacks in the rear of the building or through a gap between those obstructions. Probably the latter. He speaks of seeing the train "through that gap or opening." Plaintiff was then "behind the obstructions," that is, where they completely cut off his view to the west. There is some evidence that from points farther north, from which a traveler could look to the west of the west end of the lumber yard, a train west of the crossing might be seen but how far west the train would have to be does not appear. Blair estimated that the buildings and lumber yard would obstruct the view westward for "possibly two to three blocks" north of the crossing. He apparently considered a block about 400 feet as later in his testimony he spoke of half a block as 200 feet. Whether plaintiff could have seen the train in question while he was yet north of the lumber yard, either by looking west of the west end of the yard or through the gaps between the building and lumber stacks, would depend upon where the train then was, which could only be determined from rough estimates difficult to make and uncertain at best, based upon the varying estimates of the relative speeds of truck and train. Plaintiff did not see it. Without going further into detail we think it clear from the evidence that plaintiff cannot be charged with negligence as a matter of law for not having discovered the approach of the train while he was yet north of the lumber yard and buildings. We return therefore to the situation at and about the crossing and plaintiff's movements as he approached it.

Plaintiff was familiar with the crossing. The collision occurred about 4:30 or 5 o'clock in the afternoon. The day was cloudy and rather dark and a "drizzling" or "misting" rain was falling. Plaintiff testified it was dark and there was a heavy mist. Others said it was drizzling or misting rain. Plaintiff testified that until he neared the crossing he was driving twenty or twenty-five miles an hour, looking and listening for a train from the west. A young man named Berry rode with him, sitting at his right. (Berry was killed in the collision.) When he got within seventy-five or a hundred feet of the track he slowed down and for the last fifty feet or so drove very slowly, two or three or four miles an hour, he and Berry both listening and looking to the west. The view to the east was unobstructed and

he did not need to give much attention to that direction. When the front end of his car was, according to his estimate, ten or twelve feet from the north rail he practically stopped. He estimated that, seated behind the steering wheel, he was five or six feet farther from the rail. At that point he shifted his gears to second speed. "I am not saying that the truck stopped dead still, but I changed gear and all the time I was driving at this slow rate of speed, this fifty or seventy-five feet, me and the boy was both watching, trying to see if we could see or hear anything. . . . We was watching this blind (west) side." Explaining further about stopping he said: "It is just like this. This is the only way I can explain it to you. It was just like anybody would drive up to a stop sign in the city. You can watch the traffic and people will drive up just for the instant and put their car in second and go on. That is the way I stopped. . . . Some people call it a stop still, but I don't." Several other witnesses who had observed him thought he had brought his truck to a stop. Plaintiff testified that, seeing and hearing nothing of an approaching train, he then proceeded, looking continually to the west and gradually accelerated his speed until, when he "hit the track," he thought he was going ten or twelve miles an hour; "I imagine between ten and twelve miles an hour—I don't know just how fast." He did not see the train until the front wheels of his truck were just over the rail. "Just as I got on the front track this thing just looked like it dropped from the sky. It was right in front of me." It was too late for him to try to stop and go back. The truck was struck about midway of its length, possibly slightly nearer the front than the rear end. On cross-examination plaintiff testified that when he first saw the train "it looked to me like it was just the other side of the cattle guard." He didn't think it had quite reached the cattle guard, and he thought his truck moved only about two feet from the moment he saw the train until the collision. (The cattle guard, as shown by other witnesses, is fifty feet west of the pavement.)

John S. Robinson, fireman of the engine that struck plaintiff's truck, testified that he was on his seat box on the left, north, side of the engine, the side of the track from which plaintiff approached; that he was "looking out ahead," and that when he first saw plaintiff's truck the pilot of the engine was, he estimated, within fifty or sixty feet of the crossing, an estimate that corresponds with plaintiff's testimony as to where the train was when he first saw it. Robinson also said the day was cloudy and it was misting rain.

 I. It is conceded that the relevant substantive laws of Oklahoma, where the cause of action accrued, govern and both parties by their pleading invoke statutes and court decisions of that State. Plaintiff also invokes, as substantive law and therefore to be applied

by our courts, Section 6, Article 23 of the Constitution of Oklahoma, which reads as follows:

"The defense of contributory negligence or of assumption of risk shall, in all cases whatsoever, be a question of fact, and shall, at all times, be left to the jury."

Defendant contends that said constitutional provision is procedural rather than substantive, relating, not to the effect which the existence of contributory negligence has upon the right or the extent of recovery but only to the method or manner by which the existence of contributory negligence is to be determined, and therefore is not binding upon the courts of this State in a trial here, though the cause of action accrued in Oklahoma. Contributory negligence, if found to have been present, is a complete defense in Oklahoma as it is in this State. The difference is that with us it is the function of the court to declare the law upon a given state of facts upon that issue as upon others, while by the Oklahoma Constitution such authority, on that question, is in effect conferred upon the jury.

On the theory that said constitutional provision is in its nature procedural defendant moved to strike out that part of plaintiff's petition invoking the same. The court overruled the motion. However, it does not appear from the record that the court submitted the question of contributory negligence because it felt constrained so to do by said constitutional provision. It appears rather that it submitted it because of the opinion that the evidence presented a jury question regardless of the Oklahoma constitutional provision. The court's instructions told the jury that certain hypothesized facts, if found, constituted negligence on plaintiff's part and that if the jury found such facts then plaintiff was guilty of negligence and if such negligence directly contributed to his injury he could not recover. Under the Oklahoma constitutional provision as construed by the Supreme Court of that State, the court is not authorized to instruct or direct the jury what facts, if found, would constitute contributory negligence. That, as well as the existence of such facts, must be left to the jury. In Hines, Director General, v. Dean, 220 Pac. 860, 862, the Supreme Court of Oklahoma, citing Wichita Falls & N. W. Ry. Co. v. Woodman (Okla.), 168 Pac. 209, said:

"Under the above case and a long line of other decisions, this court has committed itself to the view that the trial court should not instruct the jury that, if a certain state of facts is found to exist, such facts constituted contributory negligence and the plaintiff cannot recover." [See, also, St. L.-S. F. Ry. Co. v. Thompson (Okla.), 281 Pac. 565, 573; St. L.-S. F. Ry. Co. v. Russell (Okla.), 266 Pac. 763, 766.]

If, therefore, the evidence does present a jury question on the issue of contributory negligence regardless of the applicability *vel non* of said Oklahoma constitutional provision, it is immaterial in this

case and need not be determined whether or not said provision is substantive and should be applied by our courts. And such we think is the case.

While in Oklahoma the court may not instruct the jury what facts will constitute contributory negligence it may instruct "what duty the law imposes upon the plaintiff as well as the defendant and that a breach of that duty is negligence." [Hines v. Dean, supra, 220 Pac. l. c. 862.] Pursuant to that rule the Oklahoma Supreme Court has in a number of crossing accident cases defined such duties. Both parties hereto invoke such decisions. ▮ Under those decisions it cannot be said as a matter of law that in all cases it is the duty of a person approaching a railroad crossing in an automobile to bring his vehicle to a complete stop before going upon the crossing. It is his duty to look and listen, to make vigilant use of his senses and not permit his attention to be diverted from the possible dangers and to use such care as is commensurate with the circumstances and surroundings to avoid injury. There may be circumstances under which he should stop, but whether or not this is true depends upon the particular facts of the case. [M. K. & T. Ry. Co. v. Stanton, 78 Okla. 167, 189 Pac. 753; Clements v. A. T. & S. F. Ry. Co. (Okla.), 253 Pac. 496, 499; C. R. I. & P. Ry. Co. v. Baroni (Okla.), 122 Pac. 926; Hines v. Dean, supra.] It should be added that a person approaching a railroad crossing in an automobile is required to exercise only the same degree of care that is required of those operating the trains, viz., ordinary care, the care that an ordinarily prudent person would exercise in the circumstances. [St. L.-S. F. Ry. Co. v. Prince (Okla.), 291 Pac. 973, 980.] The rule as to the duty of a driver approaching a railroad crossing under Oklahoma decisions does not differ greatly, if it can be said to differ substantially at all, from that in this State, unless such duty here would be affected by our statute requiring of automobile drivers the highest degree of care in driving such vehicles; a question we need not consider as no similar Oklahoma statutory requirement is invoked. Since the cause of action accrued in Oklahoma and both sides invoke the law of that State on this subject we apply the rule of law there followed. [Woodard v. Bush, 282 Mo. 163, 220 S. W. 839.] [3] Further, in Oklahoma the court is not precluded from determining and declaring as matter of law that negligence of a defendant, necessary to make liability, has not been shown. If the evidence entirely fails to show negligence the court should direct a verdict for the defendant. [New York Plate Glass Ins. Co. v. Katz, 51 Okla. 713, 152 Pac. 353.] But if the evidence is such that reasonable minds might draw different conclusions therefrom the issue should be submitted to the jury. On that question the rule is thus stated in Gipsy Oil Co. v. Green (Okla.), 198 Pac. 851, 853, quoting from C. R. I. & P. Ry. Co. v. Felder, 56 Okla. 220, 155 Pac. 529::

" 'In cases involving the question of negligence, the rule is now settled that—"When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered one of law for the court." ' " [See, also, Littlejohn v. Midland Valley Railroad Co., 47 Okla. 204, 148 Pac. 120, 121.]

The rule is the same here both as to negligence of the defendant and contributory negligence of the plaintiff. It would of course be the same as to the plaintiff's contributory negligence in Oklahoma if the court there was permitted to pass upon that question.

■ Under the evidence favorable to plaintiff in the instant case it cannot be said that it conclusively appears that he was guilty of contributory negligence. The jury could properly have found that his view to the west was practically shut off by the buildings and fence until he reached a point from which he could look to the south of the fence, which fence was but fourteen feet from the track. It was a dark day and misting rain. The box cars on the spur track must have shut off the view westward of a point about 150 feet from the pavement until the front end of plaintiff's truck was nearly or quite upon the track. If the spur track was, as Shelton testified, ten feet from the north rail of the main track, the overhang of the box cars would leave probably not more than eight feet of space between them and the main track. If Blair's estimate of six feet between the tracks be taken the space was correspondingly less. Also, Blair estimated that the spur track came to within about seventy-five feet of the pavement which would materially lessen plaintiff's view westward. But assuming that distance to have been 150 feet, a train traveling fifty to sixty miles an hour would cover it in a very short space of time. At fifty miles an hour it would run that distance in about two seconds. In passing on a demurrer to the evidence it must be assumed of course that plaintiff's evidence that no warning of the train's approach was given, that he looked and listened and neither saw nor heard the train, is true. He had practically stopped his truck and then, not having heard the statutory signals he had a right to expect if a train was approaching, thinking the track clear, he had started forward, accelerating his speed, his mind then fixed on going across. When the train suddenly and unexpectedly shot out from behind the obstructions, even if 150 feet from him, he must have been almost upon the track. Suppose that, going at the speed he was then traveling, his truck could have been stopped in a few feet. Suppose that, mathematically, it can be figured out that when he saw or, let us say, should have seen the train when it came into unobstructed view, 150 feet from him, there was still time, by instant and efficient action,

for him to have stopped in a place of safety or to have reversed and backed his truck. Does his failure to do so conclusively convict him of contributory negligence? Ordinary human beings cannot be expected always to act instantly and with absolute precision in such emergencies. The mind must grasp the situation, determine the necessary action and convey the necessary impulse to the muscles. Granted that all that may be done practically instantaneously if one is not agitated and his mind works and he acts with ideal precision, can it be said as a matter of law under circumstances such as here shown, that he is negligent if he fails so to act? We think not. Appellant cites Missouri cases such as State ex rel. Hines v. Bland (Mo.), 237 S. W. 1018; Monroe v. C. & A. Ry. Co., 297 Mo. 633, 249 S. W. 644, 650, and Evans v. Ill. Cen. Railroad Co., 289 Mo. 493, 233 S. W. 397, 399, holding that where the driver of an automobile approaching a railroad crossing had an unobstructed view for a distance of fifteen feet or more before entering upon a railroad crossing and failed to look or failed to heed what he saw if he looked, he was conclusively guilty of contributory negligence. We think that upon careful analysis of the facts those cases are not in conflict with the conclusion we have reached herein. The question of contributory negligence cannot be determined by hard and fast rules. There are general rules that apply but each case must be determined by its particular state of facts. In this case plaintiff's view westward, owing to the box cars, was not unobstructed for as much as fifteen feet north of the track except for a distance of about 150 feet. The speed of the train as well as the weather conditions must be kept in mind. When plaintiff was fifteen feet from the track the jury may well have found that the train was not where he could have seen it. Just what distance he was from the track when he first could have seen it would be difficult to determine. Speeds of train and truck are of course only estimated by the witnesses. We do not believe the facts here are such that reasonable minds could reach but one conclusion, viz., that plaintiff was contributorily negligent, and without applying the Oklahoma constitutional provision invoked we think the question of plaintiff's contributory negligence was for the jury.

■ II. Appellant complains of the court's refusal to give an instruction requested by it which would have told the jury in substance that if defendant maintained at the crossing a sign with the words "Stop-State Law" painted thereon in letters of a certain size, it was plaintiff's duty to bring his automobile to a complete stop before attempting to cross the track; which would have meant in effect that he was negligent if he did not so stop.

A statute of Oklahoma, pleaded by defendant, requires railroad companies to maintain such signs. Section 1 of the act makes it un-

lawful for any person driving an automobile to drive same across a railway track without first coming to a complete stop. Defendant maintained such a sign as required by the statute and plaintiff saw it. However, the statute in question contains this further provision:

"Section 2. Provided that the provisions of this Act shall not be taken or construed to in any way change or modify the existing laws in connection with the trial of actions growing out of grade crossing accidents."

The Oklahoma Supreme Court has construed said statute not to make it the absolute duty of such driver to stop. In St. L.-S. F. Ry. Co. v. Thompson, 281 Pac. 565, 573, that court, construing the statute, said:

"Keeping in mind these rules, it appears clear that, by the provisions of section 2 of the act, it was the intention of the Legislature that the creation of the duty found in section 1 should not in any way change or modify existing laws in connection with trials of actions growing out of crossing accidents.

"The law, as it existed at the time the act in question was passed by the Legislature, did not impose this absolute duty upon the driver of a motor-driven vehicle, nor did the law at that time make such driver guilty of negligence, as a matter of law, if he did not stop." [See, also, M. K. & T. Ry. Co. v. Stanton, supra; Clements v. A. T. & S. F. Ry. Co., supra; Hines v. Dean, supra.]

Such construction of the statute was doubtless influenced, partly at least, by the constitutional provision above referred to. But whatever the reasons underlying the interpretation and effect given the statute by the Supreme Court of Oklahoma defendant cannot ask that the courts of this State attribute to it a meaning and effect different from that which it has in the State which enacted it and in which alone it has force. The instruction was properly refused.

III. Appellant assigns error in Instructions No. 1 and No. 2, given for plaintiff, which read as follows:

"1. The court instructs the jury that the laws of Oklahoma require that a bell or steam whistle shall be placed on every locomotive engine, and that the same shall be rung or whistled at a distance of at least eighty rods from the place where the railroad shall cross any public highway.

"The laws of Oklahoma further require that when approaching a public road crossing known by them to be much and frequently used by persons and vehicles, employees operating a locomotive are bound to apprehend that travelers on the highway might be there about to cross, or in the act of crossing, and under such circumstances, the law imposes upon them the duty, as trains approach such crossings, to use ordinary care in the giving of reasonable signals of

its approach, so that such travelers may keep off the track if approaching it.

"The court instructs the jury that in determining whether or not defendant was guilty of negligence you should only consider the following grounds of negligence relied upon by the plaintiff, to-wit:

"1. That the agents, servants and employees of the defendant failed and neglected to ring the bell, and failed and neglected to sound the whistle on said locomotive, at a distance of at least eighty rods from said crossing.

"2. That the agents, servants and employees of defendant, operating said locomotive, failed to ring the bell and failed to sound the whistle on said locomotive as same approached said crossing or failed to give reasonable warning or notice of the approach of said train, when they knew, or by the exercise of ordinary care, could have known that said crossing was obstructed and that it was difficult for any person approaching said crossing from the north to see or discover the approach of a train until he was practically upon the railroad track.

"3. That the agents, servants and employees of the defendant ran and operated defendant's passenger train over and across said public crossing at a high, reckless and excessive rate of speed, to-wit: a speed of approximately 50 miles per hour, when they knew, or by the exercise of ordinary care could have known that said crossing was obstructed and was extensively used, and that persons might be crossing over said railroad track thereat at any and all times.

"Therefore, if you shall find and believe from the greater weight of the evidence that on the 11th day of September, 1929, while driving a certain automobile truck, and while attempting to cross or pass over the defendant's railroad track at a public crossing east of the depot at Dawson, Oklahoma, the plaintiff was struck and injured on said crossing by defendant's eastbound passenger train then being operated by the agents, servants and employees of the defendant, and that the injuries to the plaintiff were directly and proximately caused by the negligence of the defendant as in these instructions defined, and that the plaintiff was at the time in the exercise of ordinary care for his own safety, then your finding and verdict should be for the plaintiff."

Instruction 2. "The court further instructs the jury that if you find from the greater weight of the evidence that the defendant, its agents, servants and employees failed and neglected to ring the bell and failed and neglected to sound the whistle on said locomotive at least eighty rods before reaching said crossing, then defendant was guilty of negligence, or if you find and believe from the greater weight of the evidence that the crossing where plaintiff was struck was a much-used and traveled public crossing and that the same was ob-

structed, so that it was difficult or impossible for any person approaching same from the north to see or discover the approach of a train from the west until practically upon said crossing and defendant's employees operating the locomotive knew or by the exercise of ordinary care could have known thereof; and if you further find that as said train approached said crossing they failed to ring the bell and failed to sound the whistle on said locomotive *or if you find that said bell and whistle were sounded, yet if you further find that the signal or signals so given were not, under all the surrounding circumstances, reasonable notice and warning of the approach of said train and did not amount to exercise of ordinary care on the part of the defendant's employees operating said train,* then you are warranted in finding defendant guilty of negligence; or if you find and believe from the greater weight of the evidence that the crossing where plaintiff was struck and injured was a much-used and traveled public crossing and that the same was obstructed so that it was difficult or impossible for any person approaching same from the north to see or discover the approach of a train from the west until practically upon said crossing and defendant's employees operating the locomotive knew, or by the exercise of ordinary care could have known thereof, and of its general public use, if you so find, then it was the duty of the defendant, its agents, servants and employees to operate its trains approaching and crossing over said public highway at a reasonable rate of speed; and if you find that the defendant at the time was running its passenger train at a dangerous and reckless rate of speed considering all the facts and circumstances given in evidence concerning said crossing, and that such running was not in the exercise of ordinary care, then you will be warranted in finding the defendant guilty of negligence; and if you further find that either one or both of said acts of negligence, if any, acting separately or concurrently directly and proximately caused plaintiff's injuries, and that he was at the time in the exercise of ordinary care for his own safety, then your finding and verdict should be for the plaintiff.''

(a) It is argued that the second paragraph of Instruction No. 1, telling the jury that if the crossing was much used defendant's employees operating the train "were bound to apprehend that travelers on the highway might be there about to cross," places on such employees a greater duty than the law requires, viz., "an absolute duty making them an insurer of the safety of the traveler;" and that the instruction *assumes* that defendant was negligent because after pointing out the three grounds of negligence relied upon by plaintiff it tells the jury that if plaintiff's injuries were caused "by the negligence of the defendant as in these instructions defined," the verdict should be for him "without requiring the jury to find that the defendant was guilty of such acts of negligence." We

think the instruction is not justly subject to the criticisms offered. As to the first, the instruction does not say that those operating the train were bound to apprehend that travelers *would* be on the highway about to cross, but only that they *might* be there, etc. We cannot see how that paragraph of the instruction makes the defendant an insurer of the safety of travelers. Neither do we think the instruction assumes defendant's negligence. It requires the jury to find that plaintiff's injuries were proximately caused by the negligence of defendant "as in *these instructions*,"—not in *this* instruction—defined. Other instructions define the negligence relied upon. The instructions must be read together and when so read they clearly enough and without contradiction require the jury to find from the evidence that defendant was negligent. We are satisfied the jury could not have been misled by the wording of Instruction No. 1.

(b) A more serious question is presented by the portion of Instruction No. 2 which we have italicized, the disposition of which requires the statement of some additional facts. Plaintiff presented his case, by his pleading as well as by his evidence and instructions, on the theory that because of the obstructions to the view of a traveler on the highway approaching the crossing from the north, defendant's employees operating the train in question owed such traveler, that is, owed him in this case, the duty to give signals or warning as the train approached the crossing other than and in addition to the ringing of the bell or sounding of the whistle eighty rods from the crossing, as required by the statute. The Oklahoma statute requires that the engine bell be rung *or* that the steam whistle be sounded at least eighty rods from the crossing, but does not require that both be done or that such signal or signals be continued until the crossing is reached. Plaintiff's evidence tended to show that no signal or warning was given at all. Witnesses for defendant, however, testified that the bell was rung and that the steam whistle was sounded eighty rods from the crossing; that the bell was rung continuously from that point to the crossing and was ringing at the moment of the collision; that the steam whistle was sounded at intervals from that point to the crossing, several blasts of the whistle having been sounded in the eighty rod space immediately west of the crossing as the train approached, the last of which was begun when the engine was 100 to 150 feet west of the crossing and continued to the moment of the collision; and that in addition to those signals another whistle on the engine, called the volatone whistle, was sounding continuously from a point which must have been 600 or 700 feet west of the crossing to the point of collision. The volume and tone of the volatone whistle is not described except that one witness said: "It isn't a keen, piercing sound like most of the whisties." However, one witness testified that he was on the highway about 100 feet north of the crossing and heard

that whistle sounding steadily as the train approached the crossing while plaintiff was traversing that 100 feet. According to defendant's evidence, much of it coming from witnesses not in defendant's employ, while plaintiff was traveling the last 100 feet or so before going upon the crossing, the bell was ringing, the volatone whistle was sounding and at least one blast of the steam whistle was given, beginning, one witness estimated, when the engine was 150 feet west of the crossing and continuing to the crossing, and other blasts of the steam whistle had been given at intervals between the crossing and the point eighty rods west where the statute required the bell to be sounded or the steam whistle blown.

If the testimony of defendant's witnesses is true, a question for the jury under proper instructions, the query suggests itself, what more could the persons operating the train reasonably have done in the way of giving signals or warning of the train's approach than they did do? Appellant contends that the italicized portion of Instruction No. 2 authorized the jury to convict the defendant of negligence on the ground that its employees operating the train failed to give adequate signals even though it found that the engine bell was rung and the whistle was being sounded as the train approached the crossing, if it found, that is, if in' its opinion, such signals were not reasonable notice of the approach of the train and did not amount to the exercise of ordinary care on the part of such employees regardless of the frequency or continuity of such signals. We think there is merit in this contention. Respondent seeks to justify this part of the instruction on the ground that it refers to the statutory signal required to be given eighty rods from the crossing and that the statute, as construed by the Oklahoma Supreme Court, prescribes only the minimum duty required of railroads but not all that ordinary care may require where the surroundings at the crossing are such as are here shown. The Oklahoma statute has been so construed. [See St. L.-S. F. Ry. Co. v. Prince (Okla.), 291 Pac. 973.] In that and similar cases there was no evidence of the giving of signals continuously or at frequent intervals up to the point of collision after the statutory crossing signals had been given eighty rods from the crossing. We cannot agree that the criticized portion of the instruction refers to the statutory crossing signals and we do not think it would naturally be so understood by the jury. The instruction first tells the jury specifically that if defendant's employees failed to ring the bell and failed to sound the whistle eighty rods from the crossing defendant was guilty of negligence. Then it proceeds, disjunctively, to direct the jury concerning another pleaded ground of negligence, viz., failure to ring or whistle as the train approached the crossing, and in that connection authorizes the jury to find negligence even though the bell and whistle were sounded if the jury thought such

whistling and ringing did not constitute reasonable notice and did not amount to the exercise of ordinary care. The instruction directs a verdict for plaintiff upon a finding of negligence on one or more of the grounds submitted. Thus the jury may have believed that defendant's employees operating the train gave the signals by continuous ringing of the bell and sounding of the volatone whistle and by frequent blasts of the steam whistle as the train approached and until it reached the crossing,—a finding that would be amply supported by evidence,—and yet may have convicted defendant of negligence and returned a verdict for plaintiff because in the opinion of the jury the giving of such signals did not amount to the exercise of ordinary care. If those signals were given as defendant's evidence tends to show, plaintiff's evidence does not suggest nor does he suggest in his brief what further signals or warning of the train's approach the persons operating it could reasonably have given. The instruction gives no guidance on that point. It leaves the jury to speculate, to grope in the dark, for some fancied or possible omission on the part of the train operatives, or else to determine that, as a matter of law, the giving of the signals testified to by defendant's witnesses did not amount to the exercise of ordinary care. Juries cannot be given such roving commissions. [See Owens v. McCleary, 313 Mo. 213, 224, 281 S. W. 682.] In our opinion the italicized portion of said Instruction No. 2 is clearly erroneous and that it was prejudicial to defendant in view of the evidence on the question of defendant's negligence, cannot be doubted.

Complaint is made of the admission of certain evidence, of remarks of plaintiff's counsel in argument and of the size of the verdict. In view of the disposition we are making of the case we deem it unnecessary to discuss these assignments. For the error above pointed out the judgment is reversed and the cause is remanded. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.