**William J. FITZPATRICK, Respondent,**

v.

**ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellant.**

No. 45382.

Supreme Court of Missouri, Division No. 2.

March 11, 1957.

Motion for Rehearing or to Transfer to Court en Banc Denied April 8, 1957.

James L. Homire, W. W. Dalton, Laurance M. Hyde, Jr., St. Louis, for appellant.

Hullverson & Richardson, St. Louis, for (plaintiff) respondent.

STORCKMAN, Judge.

The plaintiff, a brakeman employed by the defendant, brought this action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. to recover damages for the loss of his right eye. The jury found for the plaintiff and assessed his damages at $45,000. Defendant's motion

for new trial was overruled on the condition that the plaintiff remit the sum of $15,000, which was done. Defendant has appealed from the plaintiff's final judgment for $30,000.

The plaintiff, 60 years old, married and living at Springfield, Missouri, began working for the defendant railroad on August 16, 1916. On August 17, 1954, he was working as a brakeman and baggageman on a run scheduled to leave Springfield at 3:05 a. m. and to arrive in St. Louis at 8:10 a. m. It was a part of his duties to watch for train order signals at various signal or order boards along the way. If there was an order it was his duty to take it aboard, usually by means of a hoop, and execute it. Also he was required to inspect the moving train on curves by looking out to see if there were any "hot boxes" or brake beams dragging.

The railroad mileposts are numbered westward from St. Louis. At milepost 69, west of Sullivan, the plaintiff was looking out of the south door of the baggage car and forward to see the position of the train order signal at milepost 68, which was a mile east. The baggage car was next to the engine, which consisted of two diesel units. The time was about 6:33 a. m. Plaintiff testified that he was supposed to keep his head out and continue looking until he got by the signal. While he was in this position he got his "eyes full of rock dust at mile 69" which "just came up from piles of ground rock that was placed along there for ballast." The train was traveling at least sixty miles per hour and the dust was "just whipped up from the velocity of the train." He got a whole lot more of the dust in his right eye than in his left one. He then went into the coach, held his eye open, and "let the water and tears wash it out." It hurt and "stung bad."

In Pacific, at the third crossing west of the station, he got dust in his eyes again. On this occasion he was in the vestibule of the streamlined coach at the head end looking out of the north side of the train in order to see the train order signal and "again it got more in the right eye than it did in the left eye." He "had a good charge" in Pacific, a whole lot more than he got "in these other places." When the train got east of Pacific plaintiff did "that same drain job all over again" and it took about ten or fifteen minutes to get it out.

Plaintiff was wearing his glasses on both occasions. At Pacific "it filled up underneath them glasses" and "it was just packed in under there, packed in solid." There wasn't anybody with plaintiff on either occasion. However, before arriving in St. Louis plaintiff had F. R. Kinney, a brakeman for the Missouri-Kansas-Texas Railways, look into his eye and help him clean his face. His eye was hurting at the time. Kinney testified that while he did not help the plaintiff clean his face, he did look into plaintiff's eye but "couldn't see anything" although the eye was bloodshot and red.

Plaintiff did not seek medical attention when he arrived in St. Louis although he was a member of the Frisco Employee's Hospital Association which maintained a hospital and dispensary there. He didn't think it was necessary; he didn't consider it serious at the time. Plaintiff left St. Louis on the return run about 5:30 p. m. and on the way his eye "got to hurting and got sensitive to light." When he arrived in Springfield at 11:26 p. m. he got from the yardmaster a "hospital slip" evidencing his employment by the railroad and his eligibility for medical treatment and hospitalization. The next morning he went to the office of Dr. W. J. Marshall and it was discovered that plaintiff was afflicted with an ulceration or corneal abscess of his right eye. Despite constant treatment the condition of the eye became steadily worse until the contents ruptured through the ulceration and the sight of the eye was lost. Plaintiff's right eye was eviscerated on September 11, 1954, and he was furnished with an artificial eye. He had been given a physical examination by the defendant about eleven days before he got the dust in his eyes. Other essential evidence will be discussed during the course of the opinion.

Plaintiff has not filed a motion to dismiss the appeal but in his brief strenuously contends that we should order such dismissal for failure to comply with Supreme Court Rule 1.08, 42 V.A.M.S. The attack is leveled at appellant's statement and some of the points relied on. An extended discussion of the complaint is unnecessary. It is sufficient to say that the statement adequately presents the facts, especially in view of respondent's right to make an additional statement as was done. Supreme Court Rule 1.08(c). The points attacked, taken in conjunction with the argument thereon, sufficiently advise the court of the questions presented for review. The penalty of dismissal is a drastic one and should not be invoked unless fully warranted. De Mayo v. Lyons, 358 Mo. 646, 216 S.W.2d 436. We will consider the appeal on its merits.

Defendant's first contention is that plaintiff did not make a submissible case because negligence and proximate causation were not shown. Plaintiff's case was submitted in the conjunctive on two theories of negligence: one was that the "inherently dangerous conditions to the performance of plaintiff's duties could have been remedied by removing, leveling and tamping the "piles" of ballast at milepost 69 and by hard surfacing the third crossing west of Pacific, Missouri; the other was that the injury could have been prevented by furnishing plaintiff with goggles without cost to him.

Plaintiff testified that about four months before August 17, 1954, around twelve or fifteen carloads of ballast were dumped "all along the outside and in the center and everywhere else" and not smoothed out. A passing train "would form a suction of dust there, a bad one." At other times "when there was no chat dumped out like there was on this occasion" there would not be any particular difficulty with dust. The plaintiff complained on three occasions to the conductor who was in charge of the train about the dust conditions at milepost 69 and at Pacific. The first was in June

and the last about ten days before the accident. Nothing was done about the conditions. A crushed rock country road crossed the railroad near milepost 69 and plaintiff did not know whether the dust "blowed off of that or blowed off of the right of way." There was a severe drouth in this area in 1954; in the words of the plaintiff, "we sure had a bad one."

One other witness testified for plaintiff as to conditions at milepost 69. She was Gussie Sappington who, with her husband, lived about a quarter of a mile west of the Sullivan station. She and her husband knew the plaintiff and customarily waved at him as the train went by. Between March and August 17 the condition around milepost 69 "was bad for dust." When the train went by "the dust and dirt would circle and go up in the air." For several years the company had been working on the track and dumping chat. It was just dumped in piles along the track. The condition she described "was present then and is now." It is "maybe worse as far as the fog and dust are concerned."

Defendant's evidence as to conditions at milepost 69 was largely consistent with that of the plaintiff. It tended to show that the last chat applied in that vicinity was on March 11, 1954. At that time more than twenty carloads were dumped and it was distributed over about three-quarters of a mile. The chat ballast was put through a washing process at the mine and was loaded into the chat cars wet. After the chat was deposited on the roadbed a plow tie was used to get it off of the track and clear the rail. It was not spread uniformly and there were heavier piles at certain locations, but there were no large mounds of it off on the right of way. It was knocked off to about the end of the railroad ties but wasn't smoothed out in any way. About August 24, 1954, the defendant equalized the track ballast by shoving it out of the heavier places and making the track section uniform. If it was too heavy in one place it was smoothed out. The ballast was dressed off uniform but no tamping was done in the

dressing process. In servicing a track the ties are raised and chat is tamped underneath in order to make the surface of the roadbed level. This had been done before the chat was unloaded

This washed chat is standard ballast with the defendant railroad and other railroads in the territory. It ranged in size from birdshot to one-half inch. After the ballast was unloaded and plowed with a tie it wasn't disturbed but permitted to settle. There were rains on the roadbed during that period. Rain tends to carry the dust and small particles down and wedge them between the larger rocks. Trains passing along also have a settling effect.

The plaintiff testified that the crossing in Pacific was a double crossing "with a lot of loose dirt and sand on it." Frank Brocato, the street commissioner of Pacific, testified that on or before August 17 the crossing in Pacific was "just gravel, sand, dirt, just anything * * *," but since that time it had been blacktopped. When asked about the dust conditions at the crossing in August, 1954, the witness stated: "It was bad," and when a train passed "it would just be a big fog of dust" but that there was very little dust at the Missouri Pacific crossings which were blacktopped. J. V. Pounds, who lived to the north and within twenty-five feet of the crossing, testified that in 1954 "you can't see after the train goes by fast, the dust follows it and it throws most of it in my house; what leaves there, they leave most of it in my house, see" and that "just the blacktop at the crossing changed it 100 per cent for dust."

Defendant's evidence tended to show that the crossing was built up to the top of the ball of the rail with six by eight timbers.[1] The crossing was solid timber and the roadbed in the vicinity was ordinary white chat. The last chat ballast put on the roadbed around Pacific was in 1953.

Plaintiff testified that the defendant did not furnish him with goggles. Defendant's

evidence was that goggles were made available by the defendant to all its employees at factory cost and were furnished free to employees engaged in "eye hazardous" occupations. Three types were available and could be obtained from the chief caller. The price of the goggles was $1.70. The goggles available would be suitable for trainmen or brakemen looking out of the doors or windows to protect them from flying dust.

■ In 56 C.J.S., Master and Servant, § 214, p. 922, it is stated: "Negligence may not be imputed to a master merely by reason of the fact that the instrumentalities or places furnished by him are dangerous; but where the services required of a servant are of a peculiarly dangerous character it is the duty of the master to make reasonable provisions to protect him from the dangers to which he is exposed while in the discharge of his duties, * * *." See also Atlantic Coast Line R. Co. v. Johnson, 5 Cir., 199 F. 2d 750, 752 [2], rehearing denied 200 F.2d 619.

In Morton v. Alton R. Co., Mo.App., 118 S.W.2d 59, the employee was engaged as one of a crew in painting defendant's railroad bridge which was across the Mississippi River. In some unexplained manner the employee fell from the deck of the bridge into the river and was drowned. Plaintiff contended that the defendant negligently failed to provide safety devices and appliances which would have rendered the place of work reasonably safe and would have prevented the drowning. These devices were alleged to be a net stretched beneath the bridge, lifeguards and boats beneath the bridge for rescue purposes, or life preservers, rescue ropes and life lines for the safety and rescue of its employees. In the course of the opinion denying recovery the court stated, 118 S.W.2d loc. cit. 62: "The master's liability being dependent upon proof of his negligence, it is at once apparent that he may not be held liable on the

---

1. Plaintiff did not allege or undertake to prove that the crossing was not constructed or maintained in accordance with statutory requirements. See § 389.610.

theory of having furnished an unsafe place if the unsafeness was inherent in the work itself (Kimberlin v. Southwestern Bell Telephone Co., Mo.App., 206 S.W. 430), nor, by the same token, may he be held guilty of negligence merely because he knows that the business he is engaged in is of a dangerous character and yet sets his servant to work at it. To the contrary, before he may be held liable in such a case *it must appear that the dangerous condition attending the place of work was not only reasonably subject to be remedied or abated, but also that he failed to take those steps which an ordinarily prudent person would have taken in order to eliminate it.* McDonald v. Morrison Plumbing & Sheet Metal Co., 209 Mo.App. 23, 236 S.W. 418." (Italics supplied.) The opinion further states, 118 S.W.2d loc. cit. 63: "We repeat that defendant's duty was only to exercise ordinary care to furnish the deceased a reasonably safe place to work, and the alleged duty of which plaintiff would now convict defendant of a breach would have necessitated the observance of an extraordinary degree of care far over and beyond what plaintiff's own evidence showed was the common and ordinary usage in such matters."

As part of its contention that no submissible case was made defendant states that "there was no basis for a finding that the particular dust plaintiff complained got behind his glasses and in his eye had come from the property of the defendant." Plaintiff conceded in his testimony that he did not know whether the dust particle that got in his eye and caused his trouble came from defendant's right of way or beyond. Manifestly this could not be determined because the transcript shows that the adjoining yards, fields, streets and highways, as well as defendant's roadbed, were dry and dusty because of the unusual drouth. The medical evidence was that one small particle or foreign body could lacerate plaintiff's eyeball and introduce the organism that caused the eye disorder. Plaintiff contends, however, that the source of the foreign body is immaterial and says that defendant's "duty extends to the property of third persons if its employee's place of work becomes dangerous by reason of property in the control of others." From this plaintiff draws the conclusion that defendant had the duty to furnish him with goggles, stating: "Goggles would work as effectively against farm dust as the fine, ground rock dust owned by appellant."

We believe this points up a vital distinction with respect to the nature and extent of defendant's duty under the conditions shown by the evidence. If the dusty conditions attending plaintiff's place of work were not reasonably subject to being remedied or abated, defendant's duty was limited to making reasonable provisions to protect him from the dangers to which he was exposed while in the discharge of his duties. Pennsylvania Pulverizing Co. v. Butler, 3 Cir., 61 F.2d 311, 314–315 [8–10].

Regardless of where the foreign body came from, we do not think that negligence could reasonably be predicated, as submitted in Instruction No. 2, upon the failure of defendant "to have removed, levelled and tamped said piles of ballast at said mile-post 69 and to have hard-surfaced the said third crossing west of Pacific, Missouri." [2] Even if the charge were supported by the evidence, which we do not think it was, we do not believe the measures suggested could reasonably be required or expected to make plaintiff's place of work safe, under the circumstances in evidence. There was no evidence that tamping would tend to eliminate the danger of dust. In fact, it is more reasonable to believe that disturbing the ballast by leveling and tamping would do more to break particles from the chat and create dust conditions than existed in the ballast which had had an opportunity to settle for approximately four months. Plaintiff's own

---

2. This was not pleaded as a basis of negligence but defendant makes no point of that fact on appeal.

evidence showed that the dust conditions continued at milepost 69 as bad or worse than before, after it had been worked on August 24. Tamping was described in the defendant's evidence as a process for leveling the roadbed *beneath the ties* and not for applying ballast around and on the ties. This does not support plaintiff's submission of failure to tamp as a ground of negligence. Plaintiff's testimony that there were no particular difficulties with dust at milepost 69 prior to the deposit of the ballast in March, 1954, is not substantial evidence that the removing, leveling and tamping of the "piles" would have eliminated the dust.

Further, the blacktopping of an area the width of the crossing at Pacific could not reasonably be expected to eliminate the danger to which plaintiff was exposed. The exposed ballast on both sides would remain with its accumulation of dust and dirt. If this crossing should have been blacktopped for plaintiff's protection, so then should every such crossing on defendant's line. This would be not only an extraordinary and unreasonable requirement, but futile as well. In times of extreme dryness dirt may be blown into a person's eyes whether they are on a paved city street, country road or a railway roadbed.

It is common knowledge that the passage of trains at high speed sets up air currents which whip up from the roadbed dirt, dust and other debris. It is our conclusion that there is no basis for saying that the extraordinary measures suggested by the plaintiff in his instruction or in the evidence would eliminate the hazards of dirt and dust entering plaintiff's eye when he looked out of the train in the performance of his duties.

The dusty conditions described in evidence were evidentiary facts in support of the need for protection against the hazard, but could not constitute a separate and independent ground of negligence in view of the conditions then existing on its right of way and beyond which could not reasonably be abated or controlled.

However, the fact that dust and dirt in the air could not be reasonably abated or controlled does not relieve defendant of its duty to protect its employees against the hazard. We believe the evidence was sufficient to make a jury issue on defendant's failure to furnish the plaintiff with goggles without cost as a protection against flying particles while in the performance of his duty. Defendant's negligence in "even the slightest" part is sufficient. See Rogers v. Missouri Pacific R. Co., 77 S.Ct. 443, 448, 459 and Webb v. Illinois Central R. Co., 77 S.Ct. 451. In the Rogers case the supreme court stated: "Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence. Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death. Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities. The statute expressly imposes liability upon the employer to pay damages for injury or death due 'in whole or *in part* to its negligence.' (Emphasis added.)" These cases are the latest pronouncement of the rules which must control our views. There are many previous cases of similar import.

Defendant cites and relies heavily upon the case of Missouri-Kansas-Texas R. Co. of Texas v. Roberts, Tex.Civ.App., 225 S.W.2d 198, 199, certiorari denied 340 U.S. 832, 71 S.Ct. 54, 95 L.Ed. 611, wherein the plaintiff-employee was an express messenger whose duties were to deliver express parcels, baggage and mail from the mov-

ing train on which he worked to the station platform. When he looked out "a bunch of this sand or gravel" he didn't know what, struck him "in the face in both eyes." An infection developed resulting in the loss of a substantial portion of the vision of his right eye. By special verdict the jury found that defendant was not negligent in failing to have the car in which plaintiff was working equipped with a glass cinder shield for him to look through in performing his duties at a nonstop station. The jury found, however, that defendant was guilty of negligence in the "methods adopted for the conduct of its business." The appellate court held that the allegation and submission of issues general in nature relating to defendant's methods of doing business was erroneous and reversed the judgment. Since Roberts did not appeal the case does not decide the propriety of submitting the failure to furnish a cinder shield. The case does not support defendant's contention.

 Defendant further contends that there was no evidence of probative value that plaintiff's diseased eye was proximately caused by the dust to which he claims he was subjected. The medical evidence tended to show that a foreign body introduced into the eye with sufficient force to lacerate the tissue could produce an infection that would bring about the ulceration or abscess with which the plaintiff was afflicted. The fact that the ulceration or abscess could have been caused by disease or causes other than accident, and the doctors could not say positively which, did not make the proof too speculative and uncertain to take the issue to the jury. Bumgardner v. St. Louis Public Service Co., 340 Mo. 521, 102 S.W.2d 594, 599 [8]; Sparks v. Auslander, 353 Mo. 177, 182 S.W.2d 167, 172 [6–8]. The trial court did not err in refusing to enter judgment for the defendant.

This leads us into the related question of defendant's complaints concerning plaintiff's verdict-directing instruction. This, Instruction No. 2, reads as follows:

"Gentlemen of the jury: You are now instructed that if you find from the evidence that for a long time prior to August 17, 1954, piles of ballast had remained on and next to the tracks of defendant near milepost 69 near Sullivan, Missouri, and that there was a large amount of dirt and dust at the third crossing west of Pacific, Missouri, and that the passage of trains of defendant would create large clouds of dirt and dust in the air alongside of the train, and that it was a part of Mr. Fitzpatrick's duties as a brakeman for the defendant to look out, forward, and along the side of moving trains at those places, and that as a result of such conditions and duties aforesaid the performance of those duties was inherently dangerous and so much so that injury to Mr. Fitzpatrick's eyes would be reasonably anticipated by a reasonably careful employer under the same or similar circumstances, and

"If you further find from the evidence that such conditions at the places mentioned above and such danger, if any, was either known by the defendant, or in the exercise of ordinary care on its part could have been discovered by it, in sufficient time before August 17, 1954, for the defendant, in the exercise of ordinary care, to have removed, levelled and tamped said piles of ballast at said mile-post 69 and to have hard-surfaced the said third crossing west of Pacific, Missouri, and that by so doing it could thus and thereby have rendered the performance of Mr. Fitzpatrick's duty aforementioned at or near said place reasonably safe, but that the defendant failed so to do, and

"If you further find from the evidence that the defendant Railway Company had in its possession goggles which were suited for use by railroad brakemen in their duties under the circumstances outlined above, and that such goggles would prevent particles of dust and dirt from entering plaintiff's eyes while engaged in his duties as a brakeman, and that the defendant failed to furnish plaintiff with goggles under the circumstances without cost to Mr. Fitzpatrick, and

498

"If you further find from the evidence in failing to remedy such condition at the places mentioned and in failing to provide goggles without cost to Mr. Fitzpatrick the defendant Railway Company failed to exercise ordinary care for the safety of Mr. Fitzpatrick and was negligent, and that the sight of Mr. Fitzpatrick's eye was lost as a result in whole or in part of such negligence,

"Then and in that event Mr. Fitzpatrick is entitled to recover, and your verdict should be in his favor, and this is so even if he was negligent in any manner contributing to cause his injury."

In considering the question of whether the plaintiff made a submissible case we have held that a conclusion could not reasonably be drawn that defendant was under a duty to abate or control the dust at its source by removing, leveling and tamping of the piles of ballast at milepost 69 and by blacktopping of the crossing in Pacific, but that a jury issue was made as to whether a duty existed to furnish plaintiff with goggles to protect him from the danger of flying particles to which his eyes were exposed under the conditions that existed during this unusually dry period in August, 1954. It follows that the failure charged to the defendant, as hypothesized in the second paragraph of Instruction No. 2, would not constitute a separate and independent ground of negligence. The instruction, therefore, does not correctly state the law.

■ Nor is the situation relieved by the fact that the charge of negligence based on abatement and control of the dust was submitted in conjunction with the failure of defendant to furnish the plaintiff with goggles. The harmless error rule does not apply where one of several grounds of negligence submitted conjunctively is an improper statement of the law, and a positive misdirection. Glowacki v. Holste, Mo., 295 S.W.2d 135, 140 [4–6]; Wilson v. Kansas City Public Service Co., Mo., 291 S.W.2d 110, 117 [12–17]; Beahan v. St.

Louis Public Service Co., 361 Mo. 807, 237 S.W.2d 105, 107 [3]. Incorporation of this erroneous hypothesis of negligence rendered the instruction misleading and confusing. The error was prejudicial.

A further serious defect appears in the failure of the instruction to hypothesize facts essential to plaintiff's recovery and especially with reference to proximate causation. The plaintiff's amended petition alleges that: "in compliance with his duties he was looking out of the side of one of the cars of said train when said train was passing over said deposit and covering referred to, and particles of same were thrown into his eyes, as a direct result of the negligence and carelessness of the defendant," and, further, that as a direct result of defendant's negligence "dust got into both of plaintiff's eyes and an excessive amount got into his right eye; that his right eye and all of the parts thereof were severely irritated, bruised and abraised; that plaintiff developed an ulcer and abscess in his eye, and that plaintiff's eye had to be removed, and plaintiff has suffered the loss of his right eye."

These allegations were not admitted and evidence was adduced in support of them. However, Instruction No. 2 does not hypothesize the facts that at the times and places in question the plaintiff, in the performance of his duty, was looking out of the train, that he was struck in the eye by particles of dirt and dust, that his eye was lacerated, thereby causing an infection which produced the ulceration or abscess that resulted in the loss of the eye. This was the theory upon which plaintiff's recovery depended and the essential controverted facts should have been submitted to the jury for their determination in plaintiff's verdict-directing instruction. 1 Raymond, Missouri Instructions, Perm.Ed., § 93, p. 76; Trusty, Constructing and Reviewing Instructions, § 5, p. 18 et seq. In Browne v. Creek, 357 Mo. 576, 209 S.W.2d 900, 904 [6], it is said that the instructions "must follow the allegations of the petition and the proof, hypothesize facts demonstrating a

legal obligation in respect to which the defendant owes some duty (Hogan v. Kansas City Public Service Co., 322 Mo. 1103, 19 S.W.2d 707, 65 A.L.R. 129) and they must factually and legally demonstrate the defendant's breach of that duty. Hutchison v. St. Louis S. F. R. Co., 335 Mo. 82, 72 S.W.2d 87."

Defendant's evidence and trial procedures were directed toward disputation of plaintiff's contention that while performing his duties at the times and places mentioned he got dust in his eyes and that such dust directly caused the ulceration that resulted in the loss of his eye. By the medical evidence defendant undertook to show that the ulceration was caused by disease and not by the accident claimed. While plaintiff was the only witness as to the actual happening, his credibility was for the jury's determination. There was evidence from which the jury could find exposures not in line of duty.

■ We believe these are essential facts and the law is well settled that an instruction purporting to cover the entire case and authorize a verdict is erroneous if it omits facts essential to the recovery. Gieseking v. Litchfield & M. Ry. Co., 339 Mo. 1, 94 S.W.2d 375, 377 [2]; Walton v. A. B. C. Fireproof Warehouse Co., 233 Mo.App. 693, 124 S.W.2d 584, 590 [7]; Reese v. Illinois Terminal Railroad Co., Mo., 273 S.W.2d 217, 222 [5-7]; Dunsmore v. Hartmann, Mo., 256 S.W. 1031, 1034 [3]; Lackey v. United Railways Co., 288 Mo. 120, 231 S.W. 956, 963 [11]. At the end of paragraph four of the instruction is a clause requiring a finding "that the sight of Mr. Fitzpatrick's eye was lost as a result in whole or in part of such negligence." This does not reach, however, the failure to hypothesize the necessary descriptive and causative factors. Because of the omission of the essential facts indicated, we hold the instruction is further prejudicially erroneous.

Since the case must be retried we will take up some of the questions here raised which may be involved at that time.

Defendant further contends that there was nothing "inherently dangerous" in the presence of the ballast and the dust at the places in question or in the performance of plaintiff's duties as a brakeman. These words are used near the end of the first paragraph of the instruction. The term "inherently dangerous" has been judicially defined as meaning "that danger inheres in the instrumentality or condition itself, at all times, so as to require special precautions to be taken with regard to it to prevent injury; instead of danger arising from mere casual or collateral negligence of others with respect to it under particular circumstances." Hull v. Gillioz, 344 Mo. 1227, 130 S.W.2d 623, 628 [6]. See also Hiltner v. Kansas City, Mo., 293 S.W.2d 422, 426, and cases therein cited. The criticism is not wholly without merit so far as the "conditions" at the two places are concerned. Also the use of the word "inherently" appears to be unnecessary and might tend to give undue emphasis or be misleading. In view of our other rulings we do not pass upon this question, but suggest that in redrafting the instruction consideration be given to eliminating "inherently" from the instruction.

■ Instruction No. 5, the measure of damages instruction, among other items, authorized the jury to assess damages for "such loss of wages and earnings, if any, as you find from the evidence, that Mr. Fitzpatrick is reasonably certain to suffer in the future as a direct result of the occurrence mentioned in evidence." Defendant contends the inclusion of this item was error because the plaintiff testified that he was "willing and able and qualified" to perform the duties of his employment, but that defendant's superintendent wrongfully disqualified him from train and baggage service when the plaintiff reported for work on November 15, 1954. Whether there are any procedures available to plaintiff to test his present qualifications and his right to reinstatement is not before us. The fact remains that plaintiff has lost all vision in his right eye; the loss is permanent. In

spite of plaintiff's estimate of his ability to perform the duties of his previous work, the jury might very properly decide that the nature of plaintiff's injury is such that his earning capacity has been impaired and that his future earnings will be diminished. Byars v. St. Louis Public Service Co., 334 Mo. 278, 66 S.W.2d 894, 903 [11]. The assignment is without merit and is denied.

■■■ Prior to the trial, defendant propounded these interrogatories to plaintiff and received these answers: "1. Please state at what mile post or mile posts you were located at the time you claim you got the particles in your eye. A. Near Mile Post 69. 2. Was the location referred to above in the country or in a town? If in a town, please give the location with reference to the street or streets. A. In the country." The defendant contends that the trial court erred in permitting plaintiff to introduce in evidence and submit his case on matters alleged to have occurred at milepost 34–20, the third crossing west of the depot in Pacific, claiming that the effect of plaintiff's answers to these interrogatories was to limit the issues by excluding this location. Defendant objected to the evidence with regard to the crossing in Pacific, and has preserved the question for review.

There can be no doubt that the plaintiff did not answer the interrogatories "fully" as contemplated by § 510.020(2). Plaintiff gave no explanation in the trial court for his failure to do so and in his brief states: "We are at loss to explain why the plaintiff did not refer to the Pacific crossing in his answers" since his amended petition specified "milepost 69, just west of Sullivan, Mo., and at or near Pacific, Mo.," and also he had mentioned both places in his deposition.

Defendant contends, however, that the purpose of this discovery practice is to narrow the issues and to limit preparation and the trial to controversial issues, thereby saving trial time and expense, citing State ex rel. Williams v. Buzard, 354 Mo. 719, 190

S.W.2d 907, 910; Silver v. Westlake, Mo., 248 S.W.2d 628, 634; Drum v. Town of Tonawanda, D.C., 13 F.R.D. 317, 319; and Chenault v. Nebraska Farm Products, Inc., D.C., 9 F.R.D. 529, 531. These cases indicate that the purpose is as defendant contends, but do not hold it is error to admit evidence in addition to or inconsistent with the sworn answers.

Interrogatories have sometimes been referred to as "the poor man's deposition" but the use that can be made of them is more extensive than that of depositions. The questions which a party may be required to answer take a wider range and the answers may be offered in evidence as the admissions of the party making them. While, under our practice, interrogatories do not actually alter or amend the pleading, situations may arise in which the trial court would be justified in treating them with similar effect. See 4 Moore's Federal Practice, 2d Ed., § 33.29(2), p. 2344, wherein it is stated: "Answers to interrogatories are not pleadings, and under ordinary circumstances they do not have the effect of limiting the party's proof in the way that pleadings do. It would not be accurate, however, to attempt to lay down any strict rule that answers to interrogatories cannot limit proof. We have seen that interrogatories do serve as adjuncts to the pleadings in limiting the issues and defining the contentions of the parties, and to this extent answers should have a limiting effect on the scope of proof at the trial just as if the matters involved were stated in the pleadings or in a pre-trial order."

The trial court should be given a wide discretion to prevent the party propounding the interrogatory from being misled and prejudiced, as well as to protect the answering party against his own mistake or inadvertence. Under the facts of this case defendant has not shown itself to be prejudiced by the ruling and we hold that the trial court did not err in admitting the evidence.

The question of excessiveness of the judgment is also raised, but, in view of the

disposition we are making of the appeal, we will not go into that question except to say that, under the facts of this case, we do not think that a retrial of the issue of liability alone is justified as it was in Glowacki v. Holste, supra.

Because of the errors noted, it is orderd that the judgment be reversed and the cause remanded.

EAGER, P. J., and JAMES W. BROADDUS, Special Judge, concur.

LEEDY, J., not sitting.